IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

FILED
JAN 07 2004 rd
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

**In the matter of a subpoena issued in the case of**

**NATIONAL ABORTION FEDERATION et al.,**

**Plaintiffs,**

**v.**

**JOHN ASHCROFT,**

**Defendant,**

**NORTHWESTERN MEMORIAL HOSPITAL,**

**Movant.**

**No. 04 C 0055**

**Judge Kocoras**

**Magistrate Judge Levin**

DOCKETED
JAN 14 2004

NOTICE OF MOTION

**TO:** Sheila M. Gowan, Esq.
Assistant United States Attorney
33 Whitehall Street, 8th Floor
New York, NY 10004

Susan Talcott Camp, Esq.
Reproductive Freedom Project
American Civil Liberties Union Foundation
125 Broad Street
New York, NY 10004

PLEASE TAKE NOTICE that on January 13, 2004 at 9:30 a.m. or as soon thereafter as counsel may be heard, I shall appear before the Honorable Judge, or any judge sitting in his stead in the courtroom usually occupied by him in the Dirksen Federal Building, 219 South Dearborn Street, Chicago, Illinois, and shall then and there present **MOTION TO QUASH SUBPOENA, AND MOTION TO FILE BRIEF IN EXCESS OF FIFTEEN PAGES IN SUPPORT OF THAT MOTION,** a true and correct copy of which is hereby served upon you.

George F. Galland, Jr., One of the Attorneys for Movant Northwestern Memorial Hospital

MINER, BARNHILL & GALLAND, P.C.
14 West Erie Street
Chicago, IL 60610
(312) 751-1170

2

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

In the matter of
a subpoena for deposition
issued in the case of

NATIONAL ABORTION FEDERATION et al.,

Plaintiffs,

v.

JOHN ASHCROFT,

Defendant,

NORTHWESTERN MEMORIAL HOSPITAL,

Movant.

04C 0055

JUDGE KOCORAS

MAGISTRATE JUDGE LEVIN

DOCKETED
JAN 14 2004

**MOTION TO QUASH SUBPOENA, AND MOTION TO FILE BRIEF IN EXCESS OF FIFTEEN PAGES IN SUPPORT OF THAT MOTION**

Pursuant to F.R.Civ.P. 45(c)(3)(A), Northwestern Memorial Hospital ('the Hospital") respectfully moves:

(1) That this Court quash a subpoena served on it on or about December 21, 2003. The subpoena and its attachments are Exhibit A to this motion.

(2) That this Court allow the Hospital to file a 22-page brief, and exhibits, in support of the motion to quash.

In support of these motions, the Hospital states as follows:

2

**Motion To Quash Subpoena**

1. The subpoena in question was issued by the Clerk of this Court in connection with a lawsuit entitled *National Abortion Federation et al. v. Ashcroft,* Case No. 03 Civ. 8695 (RCC), now pending in the United States District Court for the Southern District of New York. *NAF v. Ashcroft* is a constitutional challenge to the Partial Birth Abortion Ban Act of 2003 ("PBABA"), 18 U.S.C. §1531, signed into law on November 5, 2003.

2. Northwestern Memorial Hospital (hereafter simply "the Hospital") operates a large teaching hospital in Chicago. The Hospital operates no facilities in New York and is not a party to *NAF v. Ashcroft.*

3. One of the plaintiffs seeking to invalidate the PBABA in *NAF v. Ashcroft* is Cassing Hammond, M.D., an obstetrician and gynecologist. Dr. Hammond has staff privileges at the Hospital, but he is not employed by the Hospital.

4. The Hospital has received a subpoena, issued by this Court (the Northern District of Illinois) at the request of defendant Ashcroft in *NAF v. Ashcroft.* The subpoena appears to have come about as a result of a Declaration that Dr. Hammond filed in *NAF v. Ashcroft.* In that Declaration, he described various circumstances in which he performs certain kinds of abortion procedures that arguably are banned by the PBABA. Defendant Ashcroft then served Interrogatories and a Request for Production of Documents on Dr. Hammond, which appear as an attachment to the subpoena. In those interrogatories and document requests, defendant Ashcroft demanded that Dr. Hammond identify the Hospital's medical record number for a series of patients on whom he had performed, for differing reasons and in differing circumstances, second-

trimester abortions.

5. Dr. Hammond does not have the records themselves; the Hospital does. Defendant Ashcroft therefore caused a subpoena to be issued by the United States District Court for the Northern District of Illinois, directed at the Hospital. The subpoena demands that the Hospital produce, by January 7, 2004, "all medical records associated with those medical record numbers to be identified by plaintiff Hammond Cassing [*sic*] in response to the discovery demand served upon him in [*NAF v. Ashcroft*]." Ex. A, p. 2.

7. Pursuant to F.R.Civ.P. 45(c)(2)(B), the Hospital timely objected to the production of these records, and now respectfully moves that this Court quash the subpoena on the grounds that (1) the records are "privileged or otherwise protected from disclosure" within the meaning of Rule 45(c)(3)(B)(iii), or (2) that their production would cause an "undue burden" on the patients and on the Hospital within the mneaning of Rule 45(c)(3)(B)(iv).

Motion To File Oversized Brief

8. The Hospital has prepared a memorandum of law and exhibits in support of this Motion To Quash. Although every effort has been made to be concise, the Hospital could not address the important issues raised by this subpoena within the 15-page limit. The issues on this Motion are complex and important, involving questions of first impression under a new federal statute ("HIPAA", the Health Insurance Portability And Accountability Act) and the interplay of federal and Illinois doctrines of privilege.

9. For this reason, the Hospital respectfully requests leave to file the attached 21-page Memorandum Of Law and exhibits in support of the Motion to Quash.

George F. Galland, Jr.
Attorney for Northwestern
Memorial Hospital

George F. Galland, Jr.
Nancy L. Maldonado
14 W. Erie Street
Chicago, IL 60610
(312) 751-1170

AO 88 (Rev. 1/94) Subpoena in a Civil Case




Issued by the
**UNITED STATES DISTRICT COURT**
for the Northern District of Illinois

NATIONAL ABORTION FEDERATION, et al.,

Plaintiffs,

V.

JOHN ASHCROFT,

Defendant.

**SUBPOENA IN A CIVIL CASE**

CASE NUMBER:[1] 03 Civ. 8695 (RCC) (S.D.N.Y.)

TO: Dean M. Harrison – President and CEO
Northwestern Memorial Hospital
251 East Huron Street
Chicago, IL 60611

☐ YOU ARE COMMANDED to appear in the United States District Court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
| | DATE AND TIME |

☐ YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|
| | |

☒ YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):

All medical records associated with those medical record numbers to be identified by plaintiff Hammon Cassing in response to the discovery demand served upon him the above-captioned case. See attachment A.

| PLACE | DATE AND TIME |
|---|---|
| U.S. Attorney's Office for the Northern District of Illinois, 219 S. Dearborn St., 5th fl. Chicago, Il., 60604 | 1/7/04 10:00 a.m. |

☐ YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|
| | |

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE |
|---|---|
| Sheila M. Gowan<br>Assistant United States Attorney, Attorney for Defendant | December 18, 2003 |

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER

AUSA Sheila M. Gowan, 33 Whitehall Street, 8th Floor, New York, NY 10004 212/637-2697

EXHIBIT A

JAMES B. COMEY
United States Attorney for the
Southern District of New York
By: SHEILA M. GOWAN (SG: 8201)
SEAN H. LANE (SL: 4898)
JOSEPH A. PANTOJA (JP: 1845)
Assistant United States Attorneys
33 Whitehall Street -- 8th floor
New York, New York 10004

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

NATIONAL ABORTION FEDERATION; MARK I. EVANS, M.D.; CAROLYN WESTHOFF, M.D., M.Sc; CASSING HAMMOND, M.D.; MARC HELLER, M.D.; TIMOTHY R.B. JOHNSON, M.D.; STEPHEN CHASEN, M.D.; GERSON WEISS, M.D., on behalf of themselves and their patients,

Plaintiffs,

- against -

JOHN ASHCROFT, in his capacity as Attorney General of the United States, along with his officers, agents, servants, employees, and successors in office,

Defendant.

Government's First Set of Interrogatories and Requests for Documents Directed to Plaintiff Cassing Hammond, MD

03 Civ. 8695 (RCC)

PLEASE TAKE NOTICE THAT, pursuant to Rules 33 and 34 of the Federal Rules of Civil Procedure, and Rules 33.3 and 26.3 of this Court, defendant Attorney General John Ashcroft (the "government"), by his attorney, James B. Comey, United States Attorney for the Southern District of New York, hereby requests plaintiff Cassing Hammond, MD., to answer under oath the following written interrogatories and requests for documents, separately and fully in writing, within thirty days after the date of service of this Notice. The answers hereto should include all information known up to the date of the verification thereof.

PLEASE TAKE FURTHER NOTICE THAT each interrogatory and each subpart of each interrogatory should be accorded a separate answer. Each answer should first set forth verbatim the interrogatory to which it is responsive. Interrogatories or subparts thereof should not be combined for the purpose of supplying a common answer. The answer to an interrogatory or a subpart should not be supplied by referring to the answer to another interrogatory or subpart

thereof unless the interrogatory or subpart referred to supplies a complete and accurate answer to the interrogatory or subpart being answered.

PLEASE TAKE FURTHER NOTICE THAT these interrogatories and this request for documents are continuing and you should promptly supply by way of supplemental answers any and all additional responsive information or documents that may become known prior to the trial of this action.

## DEFINITIONS

A. DOCUMENT: The word "document" has the meaning of "documents" set forth in Rule 34(a) of the Federal Rules of Civil Procedure, and includes writings, drawings, graphs, charts, photographs, computer disks, and any other data compilations from which information can be obtained and/or translated, if necessary, by the respondent through detection devices into reasonably usable form.

B. IDENTIFY: To "identify" a person means to give, to the extent known, the person's full name, present or last known home address and telephone number, and the present or last known address and telephone number of place of employment. To "identify" a document means to give, to the extent known, (a) the type of document; (b) the general subject matter; (c) the date of the document; (d) the author(s), addressee(s) and recipient(s); and (e) if the document is a medical record, the location where the medical record is kept. To identify a firm, partnership, corporation, business trust or other association or a division, department or unit means to give, to the extent known, its full name and principal office address and telephone.

C. ADDITIONAL TERMS: The definitions of "communication," terms referring to parties, "person," "concerning," "all," "each," "and," "or," and other terms contained in Rule 26.3 of the Civil Rules of the United States District Court for the Southern District of New York apply herein.

D. MEDICAL RECORD NUMBER: "Medical record number" means the number assigned to the medical records relating to a particular patient or other identifier

sufficient to enable retrieval of the patient's medical records.

**INSTRUCTIONS**

E. Responses to requests to identify documents and persons shall be in accordance with Rules 26.3(c)(3) and (4) of the Civil Rules of the United States District Court for the Southern District of New York.

F. Where duplicate copies of one document exist, these need not be produced unless they contain writings or notes which do not appear on all other copies of that document.

G. If you refuse to identify and/or withhold any document requested herein on the ground of privilege, you must comply with the requirements of Rule 26.2(a)(1) and (2)(A) of the Civil Rules of the United States District Court for the Southern District of New York in setting forth the information listed therein with respect to each claim of privilege.

**INTERROGATORIES**

1. Identify the patient medical record number for the abortions services that you have performed or supervised within the year 2003 for women who are nineteen (19) to twenty (20) weeks LMP and "who are ending wanted pregnancies after learning that their fetuses have anomalies that are often quite severe," as stated in paragraph 4 of your declaration in this case.

2. Identify the patient medical record number for the abortions services that you have performed or supervised within the year 2003 for women who are nineteen (19) to twenty (20) weeks LMP and "who must end pregnancies in order to preserve their health," as stated in paragraph 4 of your declaration in this case.

3. Identify the patient medical record number for the abortions services that you have performed or supervised within the year 2003 for women who are nineteen (19) to twenty (20) weeks LMP and who are "experiencing pregnancy loss, which in lay terms is sometimes called miscarrying," as stated in paragraph 4 of your declaration in this case.

4. Identify the patient medical record number for the abortions services that

you have performed or supervised within the year 2003 "where, if the pregnancy continued, the fetus would die before onset of labor or within the first year of life because of Trisomy 13 or Trisomy 18," as stated in paragraph 5 of your declaration in this case.

5. Identify the patient medical record number for those abortions that you have performed or supervised within the year 2003 because the fetus had "anencephaly and other severe neural tube defects" as stated in paragraph 5 of your declaration in this case.

6. Identify the patient medical record number for those abortions that you have performed or supervised within the year 2003 because the patient was "suffering from severe oligohydramnios" as stated in paragraph 5 of your declaration in this case.

7. Identify the patient medical record number for the abortion that you performed or supervised for the patient who had leukemia as stated in paragraph 6 of your declaration in this case.

8. Identify the patient medical record number for the abortion that you performed or supervised for the patient who had "renal failure and HELLP syndrome" as stated in paragraph 6 of your declaration in this case.

9. Identify the patient medical record numbers for the abortions that you performed or supervised within the year 2003 for patients who are sixteen (16) or more weeks LMP who had "breast cancer and have chosen abortion because continued pregnancy might worsen their prognosis and delay appropriate treatment of cancer" as stated in paragraph 6 of your declaration in this case.

10. Identify the patient medical record numbers for the abortions that you performed or supervised within the year 2003 for patients who are sixteen (16) or more weeks LMP who had "severe cardiac conditions; continued pregnancy would put them at risk of further heart failure and even death" as stated in paragraph 6 of your declaration in this case.

11. Identify the patient medical record numbers for the abortions that you performed or supervised within the year 2003 for patients who are sixteen (16) or more weeks

LMP who had "chorioamnionitis" as stated in paragraph 6 of your declaration in this case.

12. Identify the patient medical record numbers for the abortions that you performed or supervised within the past two (2) years for patients who are sixteen (16) or more weeks LMP who had "life-threatening rejection of transplanted vital organs, such as the liver" as stated in paragraph 6 of your declaration in this case.

13. Identify the patient medical record numbers for the abortions that you performed or supervised within the past two (2) years for patients who are sixteen (16) or more weeks LMP who had "severe neurological disease including brain tumors" as stated in paragraph 6 of your declaration in this case.

14. Identify the patient medical record numbers for the abortions that you performed or supervised within the past two (2) years for patients who are sixteen (16) or more weeks LMP who had "severe complications from diabetes" as stated in paragraph 6 of your declaration in this case.

15. Identify the patient medical record numbers for the abortions that you performed or supervised within the past two (2) years for patients who are sixteen (16) or more weeks LMP who had "cerebrovascular disease" as stated in paragraph 6 of your declaration in this case.

16. Identify the patient medical record numbers for the abortions that you performed or supervised within the past two (2) months for patients who are sixteen (16) or more weeks LMP and who experience "pregnancy loss or, in lay terms, 'miscarriage,'" and where fetal demise has already occurred as stated in paragraph 7 of your declaration in this case.

17. Identify all persons to whom you have taught the "intact D&E method" as referred to in paragraph 16 of your declaration in this case.

18. Identify any document and/or data that supports your belief (as stated in paragraph 19(b) of your declaration in this case) that intact D&E "*decrease[s]* risks to the woman as compared with procedures that involve more dismemberment and thus more 'blind'

instrumentation.'" Id. (emphasis in the original).

19. Identify which, if any, of the "Scholarly Productivity" listed in the curriculum vitae submitted with your declaration in this case concern the abortion method intact D&E, also known as intact dilation and extraction or D&X as stated in paragraph 39 of the complaint.

20. Identify which, if any, of the "Publications" and/or "Publications in Press" listed in the curriculum vitae submitted with your declaration in this case concern the abortion method intact D&E, also known as intact dilation and extraction or D&X as stated in paragraph 39 of the complaint.

21. Identify which, if any, of the "Ongoing Studies" listed in the curriculum vitae submitted with your declaration in this case concern the abortion method intact D&E, also known as intact dilation and extraction or D&X as stated in paragraph 39 of the complaint.

22. Identify the case caption and case number for all legal proceedings in which you have testified concerning the abortion method intact D&E, also known as intact dilation and extraction or D&X as stated in paragraph 39 of the complaint.

23. Identify the case caption and case number for all legal proceedings in which you have submitted declarations and/or affidavits concerning the abortion method intact D&E, also known as intact dilation and extraction or D&X as stated in paragraph 39 of the complaint.

24. Identify the patient medical record numbers for the abortions performed or supervised by you, during or after the second trimester of a patient's pregnancy, within the year 2003, where a procedure utilizing injection(s) of chemical of agent(s) in order to effect intrauterine fetal demise was considered but its use was rejected either by you or by the patient.

25. Identify the state(s) of residence of all patients for whom you have performed or supervised an abortion within the past three years by the abortion method intact D&E, also known as intact dilation and extraction or D&X as stated in paragraph 39 of the

complaint.

## DOCUMENT REQUESTS

1. All documents identified in response to any interrogatory set forth herein.

2. The medical records associated with the patient medical record numbers identified in response to interrogatory numbers 1 through 16, and 24.

3. All transcripts of your testimony identified in response to interrogatory number 22.

4. All declarations and/or affidavits identified in response to interrogatory number 23.

5. All teaching material that you have prepared concerning the abortion method intact D&E, also known as intact dilation and extraction or D&X as stated in paragraph 39 of the complaint.

6.. All teaching material that you have used concerning the abortion method intact D&E, also known as intact dilation and extraction or D&X as stated in paragraph 39 of the complaint.

7. All written materials that relate to your response to interrogatories 19 through 21.

8. All documents and/or visual depictions used by you to inform or educate your patients (or prospective patients) about the abortion method intact D&E, also known as intact dilation and extraction or D&X as stated in paragraph 39 of the complaint.

9. Examples of all consent forms (blank) used by you for abortions performed by the method intact D&E, also known as intact dilation and extraction or D&X as stated in paragraph 39 of the complaint.

10. All statistics kept by you concerning the type of abortion procedure performed on patients within the past two (2) years.

11. All written material prepared by you concerning the abortion method

intact D&E, also known as intact dilation and extraction or D&X as stated in paragraph 39 of the complaint.

Dated: New York, New York
November 21, 2003

Respectfully submitted,

JAMES B. COMEY
United States Attorney for the
Southern District of New York,
Attorney for Defendant

By: /s/
SHEILA M. GOWAN (SG: 8201)
SEAN H. LANE (SL: 4898)
JOSEPH A. PANTOJA (JP: 1845)
Assistant United States Attorneys
33 Whitehall Street – 8th Floor
New York, New York 10004
Tel. No.: (212) 637-2697

**Certificate of Service**

I, SHEILA M. GOWAN, Assistant United States Attorney for the Southern District of New York, hereby certify that on the 21st of November, 2003, I caused the service of a true copy of the foregoing First Set of Interrogatories and Requests for Documents Directed to Plaintiff Cassing Hammond, M.D., by overnight mail, next business day delivery, upon counsel for plaintiffs addressed as follows:

Susan Talcott Camp, Esq.
Reproductive Freedom Project
American Civil Liberties Union Foundation
125 Broad Street
New York, New York 10004

Dated: New York, New York
November 21, 2003

/s/
SHEILA M. GOWAN

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

**In the matter of a subpoena issued in the case of**

| | | |
|---|---|---|
| **NATIONAL ABORTION FEDERATION et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| **v.** | ) | |
| | ) | |
| **JOHN ASHCROFT,** | ) | |
| | ) | **No. 04 C 0055** |
| **Defendant,** | ) | |
| | ) | **Judge Kocoras** |
| **NORTHWESTERN MEMORIAL** | ) | |
| **HOSPITAL,** | ) | **Magistrate Judge Levin** |
| **Movant.** | ) | |

**MEMORANDUM IN SUPPORT OF NORTHWESTERN MEMORIAL HOSPITAL'S MOTION TO QUASH SUBPOENA**

## TABLE OF CONTENTS

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

A. The underlying lawsuit in which the subpoena was issued . . . . . . . . . . . . 2

B. Dr. Hammond's Declaration and the resulting subpoena . . . . . . . . . . . . . 2

C. The "authorization" order and how it was obtained . . . . . . . . . . . . . . . . . 3

D. The Hospital's response to the subpoena . . . . . . . . . . . . . . . . . . . . . . . . . 4

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

I. THE HOSPITAL RECORDS OF THESE PATIENTS' ABORTIONS ARE PRIVILEGED FROM DISCLOSURE . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

A. HIPAA, Read Together With Illinois Law, Protects These Records From Disclosure . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

B. HIPAA Aside, The Records Are Privileged . . . . . . . . . . . . . . . . . . . . . 12

C. This Court Has Discretion to Apply Illinois Law to Bar Disclosure . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

II. PRODUCTION OF THESE RECORDS IS AN "UNDUE BURDEN" ON THE PATIENTS AND THE HOSPITAL . . . . . . . . . . . . . . . . . 20

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

## TABLE OF AUTHORITIES

Cases | Page

*Best v. Taylor*, 179 Ill.2d 367, 689 N.E.2d 1057 (1997) . . . . . 10, 11

*Clarkson v. Central DuPage Hospital*, 105 Ill.App.3d 850, 435 N.E.2d 140 (1st Dist. 1982) . . . . . 8, 9

*Jaffee v. Redmond*, 518 U.S. 1 (1996) . . . . . 13-18

*Johnson v. Nyack Hospital*, 169 F.R.D. 550 (S.D.N.Y. 1996) . . . . . 19

*Memorial Hospital of McHenry County v. Shadur*, 664 F.2d 1058 (7th Cir. 1981) . . . . . 12, 18, 19

*Miscellaneous Docket Matter #1 v. Miscellaneous Docket Matter #2,* 197 F.3d 922 (8th Cir. 1999) . . . . . 20

*Parkson v. Central DuPage Hosp.*, 105 Ill.App.3d 859, 435 N.E.2d 140 (1st Dist. 1982) . . . . . 4

*Patterson v. Caterpillar*, 70 F.3d 503 (7th Cir. 1995) . . . . . 13

*People v. Herbert*, 108 Ill.App.3d 143, 438 N.E.2d 1255 (1st Dist. 1982) . . . . . 19

*Pesce v. J. Sterling Morton H. S.* , 830 F.2d 789 (7th Cir. 1987) . . . . . 4

*Spurgeon Green v. Silver Cross Hospital*, 1985 WL 1463 (N.D. Ill. 1985) . . . . . 19

*Steinberg v. Carhart,* 530 U.S. 914 (2000) . . . . . 2, 15

*Trammel v. United States*, 445 U.S. 40 (1980) . . . . . 13

*United States v. King*, 73 F.R.D. 103 (E.D.N.Y. 1976) . . . . . 19

*United States v. The Louisiana Clinic,* 2002 WL 31819130 (E.D.La. 2002) . . . . . 6

Statutes and Regulations

Partial Birth Abortion Ban Act of 2003 ("PBABA"), 18 U.S.C. §1531 . . . . . *passim*

Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), Pub. L. 104-191, 110 Stat 1936 . . . . . *passim*

Health Insurance Portability and Accountability Act of 1996 ("HIPAA") (Implementing Regulations):

45 C.F.R. §160.202 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

45 C.F.R. §160.203(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

45 C.F.R. §164.501 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

45 C.F.R. 164.512(e)(1)(I) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 7

Hospital Licensing Act, §6.17(b), 210 ILCS 85/6.17(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Medical Patients Rights Act, §3(a), 410 ILCS 50/3(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 9

Code of Civil Procedure, §8-802, 735 ILCS 5/8-802 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Other Authority

F.R.Civ.P. 45(b)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

F.R.Civ.P. 45(c)(1)(A)(iii) and (iv) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 20

F.R.Ev. 501 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13, 17

Illinois Constitution, Article I, §12 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10-11

Silver, Stephen Aaron, *Beyond Jaffee v. Redmond: Should the Federal Courts Recognize a Right to Physician-Patient Confidentiality?*, 58 Ohio St.L.J. 1809 (1998) . 13

The Attorney General of the United States has subpoenaed from Northwestern Memorial Hospital ("the Hospital") the medical records of a number of women who had second-trimester abortion procedures at the Hospital. These women, and the Hospital, which is required by law to maintain its patients' records in a confidential fashion, are caught in the crossfire of a dispute to which they are not parties: a lawsuit in the Southern District of New York challenging the new federal Partial Birth Abortion Ban Act. One of the plaintiffs in that lawsuit is these women's obstetrician, Cassing Hammond, M.D., who is on staff at the Hospital. In that suit, Dr. Hammond filed a Declaration describing instances in which he has performed second-trimester abortion procedures. Defendant Ashcroft then demanded that Dr. Hammond identify the patients, and subpoenaed their records from the Hospital.

After stating the facts, the Hospital will show that this subpoena must be quashed pursuant to F.R.Civ.P. 45(c)(A), because it seeks matter that is privileged or protected from disclosure, and because it would impose an undue burden on both these women and the Hospital. Not only will the subpoena produce nothing of value to deciding the issues in *NAF v. Ashcroft,* but it rests on an unacceptable principle – that by providing expert medical testimony in a lawsuit, a physician opens the door to subpoena of the confidential medical records of patients who have no interest in that lawsuit. If accepted, this principle would undermine patients' confidence in their physicians, and would deter physicians from offering medical testimony in many different kinds of lawsuits.

## FACTS

**A. The underlying lawsuit in which the subpoena was issued.** The lawsuit in which the Attorney General obtained the subpoena is *National Abortion Federation et al. v. Ashcroft,* Case No. 03 Civ. 8695 (RCC), pending in the United States District Court for the Southern District of New York. *NAF v. Ashcroft* is a constitutional challenge to the recently-enacted Partial Birth Abortion Ban Act of 2003 ("PBABA"), 18 U.S.C. §1531. The complaint in *NAF v. Ashcroft* (Exhibit A) alleges that the PBABA is unconstitutional under *Steinberg v. Carhart,* 530 U.S. 914 (2000), which invalidated Nebraska's "partial birth abortion" statute.

The Hospital is a large teaching institution in Chicago. It is not a party to *NAF v. Ashcroft.* The Hospital maintains no facilities in New York. Declaration of Rachel Dvorken, attached to this brief as Exhibit B, ¶2.

**B. Dr. Hammond's Declaration and the resulting subpoena.** Dr. Hammond has privileges to practice at the Hospital, but the Hospital does not employ him. Dr. Hammond's decision to become a plaintiff in *NAF v. Ashcroft* was his own. The Hospital's management was unaware of his involvement in this suit until it was filed. Ex. B, ¶3.

The Court hearing *NAF v. Ashcroft* granted a TRO against enforcement of the PBABA on the ground that, like the statute in *Carhart,,* it lacks an exception to protect the health of the woman. In connection with the TRO motion, Dr. Hammond submitted a Declaration (Exhibit C). The gist of his Declaration is (1) he has patients in a number of specific circumstances who need second-trimester abortions for the protection of their health, and (2) he fears prosecution under the PBABA because its definition of prohibited procedures does not let him know whether or not he may be violating the Act.

Defendant Ashcroft then served interrogatories and document requests on Dr. Hammond, asking him to identify the patient medical record numbers of each patient who fell within the descriptions in his Declaration, and to produce their medical records. Exhibit D. Dr. Hammond informed defendant that he does not have the records in question; the Hospital does.

**C. The "authorization" order and how it was obtained.** On December 18, 2003, the district judge hearing *NAF v Ashcroft* entered the following order (Exhibit E):

> In accord with the Health Insurance Portability and Accountability Act of 1996 ("HIPPA" [*sic*]), 45 C.F.RF. 164.512(e)(1)(i), non-party witness Northwestern Memorial Hospital (the "hospital") is authorized to disclose to the Defendant the medical records and information sought in the attached subpoena to be served on the Hospital by the Defendant pursuant to Rule 45 of the Federal Rules of Civil Procedure.

This order was issued without notice to the Hospital. Sheila M. Gowan, an Assistant United States Attorney from the Southern District of New York who represents defendant in *NAF v. Ashcroft*, wrote a brief letter on December 16, 2003, to District Judge Richard Conway Casey, asking that "the enclosed orders" be entered. Ms. Gowan did not notify the Hospital that she was asking Judge Casey to enter this order. Ex. B, ¶6. She sent a copy of the letter to Talcott Camp, counsel for plaintiffs, but expressly did not enclose a copy of the proposed order that she was submitting to Judge Casey. Ex. F.

Ms. Camp asked Ms. Gowan for a copy of the order that she was asking Judge Casey to enter. Ms. Gowan refused. Ex. G. Ms. Camp then wrote the Court, asking it to require Ms. Gowan to show her the proposed orders. She also requested the Court not to enter any such orders until plaintiffs could review them and make their position known to the Court. Exhibit H. Ms. Gowan then wrote Judge Casey another letter, dated December 18, 2003, defending her

refusal to show Ms. Camp the order that she was asking Judge Casey to sign. Exhibit I. Judge Casey entered the order, apparently in the form requested, that day. Ex. E.

**D. The Hospital's response to the subpoena.** After obtaining the above order in *NAF v. Ashcroft,* Ms. Gowan caused the Northern District of Illinois to issue the subpoena to the Hospital. The subpoena demands "All medical records associated with those medical record numbers to be identified by plaintiff Hammond Cassing [*sic*] in response to the discovery demand served upon him in [*NAF v. Ashcroft*]." Exhibit J.

The Hospital was served with the subpoena on or about December 21, 2003. Ms. Gowan has agreed that if the Hospital is ordered to produce the records, it may initially redact patient-identifying information from the records, without defendant Ashcroft's waiving the right to seek this information later. Exhibit K.

**ARGUMENT**

The patients whose records have been subpoenaed underwent a medical procedure pursuant to a constitutional right which, according to the Supreme Court, derives from the federal Constitution's protection of *privacy*. Yet the Attorney General demands the confidential records of those women's procedures for use in a public trial, in a lawsuit to which they are not parties.

The Hospital has standing to assert its patients' privacy rights in these records. *Pesce v. J. Sterling Morton H. S.,* 830 F.2d 789, 797 (7th Cir. 1987). Under Illinois law, it *must* do so. *Parkson v. Central DuPage Hosp.,* 105 Ill.App.3d 859, 435 N.E.2d 140, 142 (1st Dist. 1982).

F.R.Civ.P. 45(c)(3)(A)(iii) and (iv) command this Court to quash this subpoena if the matter it seeks is "privileged or otherwise protected" or if it imposes an "undue burden on any

person." Both conditions are met here.

## I. THE HOSPITAL RECORDS OF THESE PATIENTS' ABORTIONS ARE PRIVILEGED FROM DISCLOSURE

### A. HIPAA, Read Together With Illinois Law, Protects These Records From Disclosure

The Attorney General asserts that the regulations prescribed under the Health Insurance Portability and Accountability Act ("HIPAA") allow these records to be disclosed. He is mistaken. HIPAA, read together with Illinois law, *protects* these records from disclosure.

In HIPAA (Pub. L. 104-191, 110 Stat 1936), Congress ordered the Department of Human Services to develop new regulations to simplify the administration of health insurance and to protect the privacy and security of patient health information. HHS published final privacy regulations which became effective April 14, 2001. The privacy standards apply to "Protected Health Information," whose definition includes the medical records subpoenaed from the Hospital. 45 C.F.R. §164.501.

Both the statute and the HHS regulations provide that if State law provides more stringent privacy standards than the HHS regulations, State law will govern in that State. This so-called "anti-preemption" provision in HIPAA, 42 U.S.C. §1320d-7(a)(2), reads, in relevant part:

> A provision or requirement under this part, or a standard or implementation specification adopted or established under sections 1320d-1 through 1320d-3 of this title, shall not supersede a contrary provision of State law, if the provision of State law . . . (B) . . . relates to the privacy of individually identifiable health information.

HHS's privacy regulations flesh out this provision. Under 45 C.F.R. §160.203(b), a HIPAA standard or requirement does not preempt a "contrary" provision of State law if the State

law provision "relates to the privacy of individually identifiable health information and is more stringent than" a standard in the HHS regulations. "Contrary" means, among other things, that "A covered entity would find it impossible to comply with both the State and federal requirements." A State law is "more stringent" than the HIPAA standard if, among other things, it "restricts a use or disclosure in circumstances under which such use or disclosure otherwise would be permitted under this subchapter. . ." 45 C.F.R. §160.202.

Putting these provisions together, the analysis for purposes of the present dispute is as follows. First, what do the HIPAA regulations provide, and what does Illinois law provide, about the disclosure in judicial proceedings of the medical records in question? Second, is Illinois law "contrary to" and "more stringent than" what the HIPAA regulations provide? If so, for purposes of HIPAA, Illinois law governs what an Illinois hospital like the Hospital should do.

In *United States v. The Louisiana Clinic,* 2002 WL 31819130 (E.D.La. 2002), a *qui tam* case, this analysis was applied to a subpoena of medical records. The relators alleged that a clinic and its physician defrauded the federal government by presenting false claims to Medicare. The relators sought from the clinic the medical records of patients. To decide whether HIPAA's anti-preemption provision required the subpoena to be quashed, the court compared Louisiana privacy standards with the HIPAA standards, decided that Louisiana privilege law was not "more stringent" than the HIPAA standards, and hence ordered disclosure.

The same analysis in the present case produces the opposite result.

**1. The HIPAA regulations allow disclosure of nonparties' hospital records in a lawsuit, but Illinois law does not.** HIPAA contains a "standard" governing "disclosures for judicial proceedings." That standard allows a covered entity like the Hospital to disclose

protected health information in the course of any judicial proceeding in response to a subpoena, even without notice to the subject of the protected health information, so long as the covered entity has received satisfactory assurance from the party seeking the information that "reasonable efforts have been made by such party to secure a qualified protective order meeting the requirements of paragraph (e)(1)(v) of this section." 45 C.F.R. §164.512(e)(1)(ii)(B). Under paragraph (e)(1)(v), a "qualified protective order" need only prohibit the parties from using or disclosing the protected health information for any purpose other than the litigation, and require the return to the covered entity of the protected health information at the end of the proceeding.

This approach of the HIPAA regulations toward disclosure of medical records in judicial proceedings is the opposite of Illinois law, both statutory and constitutional.

**Statutes.** Numerous Illinois statutes express the legislature's intolerance for allowing Illinois citizens' confidential medical information to be dragged into lawsuits to which they are not parties. Three of these statutes deal with any kind of medical information: the Code of Civil Procedure, the Hospital Licensing Act, and the Medical Patients Rights Act. Of these, the most detailed, and the one designed specifically to govern disclosures in lawsuits, is §8-802 of the Code of Civil Procedure, 735 ILCS 5/8-802. It reads:

> No physician or surgeon shall be permitted to disclose any information he or she may have acquired in attending any patient in a professional character, necessary to enable him or her professionally to serve the patient, except only (1) in trials for homicide when the disclosure relates directly to the fact or immediate circumstances of the homicide, (2) in actions, civil or criminal, against the physician for malpractice, (3) with the expressed consent of the patient, or in case of his or her death or disability, of his or her personal representative or other person authorized to sue for personal injury or of the beneficiary of an insurance policy on his or her life, health, or physical condition, (4) in all actions brought by or against the patient, his or her personal representative, a beneficiary under a policy of insurance, or the executor or administrator of his or her estate wherein

> the patient's physical or mental condition is an issue, (5) upon an issue as to the validity of a document as a will of the patient, (6) in any criminal action where the charge is either first degree murder by abortion, attempted abortion or abortion [*sic*], (7) in actions, civil or criminal, arising from the filing of a report in compliance with the Abused and Neglected Child Reporting Act, (8) to any department, agency, institution or facility which has custody of the patient pursuant to State statute or any court order of commitment, (9) in prosecutions where written results of blood alcohol tests are admissible pursuant to Section 11-501.4 of the Illinois Vehicle Code or (10) in prosecutions where written results of blood alcohol tests are admissible under Section 5-11a of the Boat Registration and Safety Act, or (11) in criminal actions arising from the filing of a report of suspected terrorist offense in compliance with Section 29D-10(p)(7) of the Criminal Code of 1961.

By its plain language, this statute is an exclusive list of civil and criminal actions in which medical information may be divulged that was acquired by a physician treating a patient in his or her professional capacity. It makes absolutely no exception beyond its eleven categories, and has no provision for disclosing "redacted" records.

*Clarkson v. Central Dupage Hospital,* 105 Ill.App.3d 850, 435 N.E.2d 140 (1st Dist. 1982), held that hospitals whose medical records were subpoenaed in lawsuits had an obligation to assert a privilege afforded to their patients by §8-802. *Clarkson* further held that the statute forbids the disclosure in a lawsuit of the medical records of nonparties to the litigation – even if the litigation is of a category mentioned by the statute:

> Although the Illinois statute on the physician-patient privilege exempts civil malpractice actions, we believe that the exception should be limited to only allow the disclosure of the records of the patient who is bringing the malpractice action. A broadening of that exception to allow the disclosure of communications involving patients who are not parties to the litigation would neither serve a public interest nor the private interests of those non-party patients.

435 N.E.2d at 143. The Court further held that redaction of names and identifying numbers from the records could not justify departure from the privilege. *Id.* at 143-144.

The Hospital Licensing Act and the Medical Patients Rights Act are consistent with, and reinforce, the conclusion of *Clarkson*. The Hospital Licensing Act prohibits disclosure of the "nature or details of services provided to patients," with certain exceptions. The only exception pertaining to civil lawsuits is disclosure for "defense of claims brought against the hospital arising out of the care." The more general Medical Patients Rights Act is consistent with this scheme.[1]

---

[1] §6.17(b) of the Hospital Licensing Act, 210 ILCS 85/6.17(b), reads:

> No member of a hospital's medical staff and no agent or employee of a hospital shall disclose the nature or details of services provided to patients, except that the information may be disclosed to the patient, persons authorized by the patient, the party making treatment decisions, if the patient is incapable of making decisions regarding the health services provided, those parties directly involved with providing treatment to the patient or processing the payment for that treatment, those parties responsible for peer review, utilization review or quality assurance, risk management, or defense of claims brought against the hospital arising out of the care, and those parties required to be notified under the Abused and Neglected Child Reporting Act, the Illinois Sexually Transmissible Disease Control Act, or where otherwise authorized or required by law.

§3(a) of the Medical Patients Rights Act, 410 ILCS 50/3(a), guarantees patients the right to "privacy and confidentiality of records except as otherwise provided by law." §3(d) of that Act guarantees "[t]he right to each patient to privacy and confidentiality in health care," and further provides:

> Each physician, health care provider, health services corporation and insurance company shall refrain from disclosing the nature or details of services provided to patients, except that such information may be disclosed to the patient, the party making treatment decisions if the patient is incapable of making decisions regarding the health services provided, those parties directly involved with providing treatment to the patient or processing the payment for that treatment, those parties responsible for peer review, utilization review and quality assurance, and those parties required to be notified under the Abused and Neglected Child Reporting Act, the Illinois Sexually Transmissible Disease Control Act, or where otherwise authorized or required by law. This right may be waived in writing by the patient or the patient's guardian, but a physician or other health care provider may not condition the provision of services on the patient's or guardian's

**The Illinois Constitution.** *Best v. Taylor,* 179 Ill.2d 367, 689 N.E.2d 1057 (1997), makes it clear that the Illinois Constitution's guarantee of privacy in Article I, §§6 and 12 protects Illinois citizens from disclosure without their consent of their confidential medical information in judicial proceedings in which they have no interest, absent an urgent public purpose justifying such an intrusion into their privacy. Thus, the Constitution is another "State law" that is contrary to and more stringent than the HIPAA regulations' provisions on such disclosure.

In *Best*, the Illinois Supreme Court held unconstitutional, as invading the right of privacy guaranteed by the Illinois Constitution, a statute that allowed defense lawyers in malpractice cases to communicate privately with the plaintiff's treating physicians about the plaintiff's treatment. Under the statute, filing a personal injury suit waived "any privilege between the injured person and each health care provider who has furnished care at any time to the injured person." Upon request, the plaintiff had to execute a consent (1) authorizing any person who had provided health care to the plaintiff to furnish the defendant a copy of that provider's medical record, and (2) authorizing any such provider to discuss privately with the defendant's attorney the provider's treatment and its implications for the claim. Under the statute, any records obtained pursuant to that consent were confidential and could be made only to persons involved in the litigation itself. 689 N.E.2d at 1090.

*Best* held that this statute was an unconstitutional infringement on the right of privacy guaranteed by Article I, sections 6 and 12 of the Illinois Constitution. *Best*, 689 N.E. 2d at 1100. Under *Best,* any Illinois statute or common-law doctrine allowing litigants to subpoena and use

---

agreement to sign such a waiver.

the confidential records of patients with no interest in the litigation would be unconstitutional as well, absent some urgent public purpose that is utterly lacking in the present case. First, such an invasion of privacy is more severe than then the invasion in *Best*. There, the defense attorney already had the plaintiff's medical records, and the infringement of privacy condemned by the Court consisted merely of the attorney discussing those records privately with the physician who had made them. This seems a trivial invasion of privacy compared to the present situation. The Attorney General seeks confidential and sensitive records he does *not* have, for use in a public trial in which the patients have no interest. Second, in *Best,* by starting a lawsuit, the plaintiff had diluted his privacy interest. Here, the patients, strangers to the lawsuit, have done nothing justifying diluting their privacy. Third, like HIPAA's "qualified protective order" provisions, the statute invalidated in *Best* restricted the use of confidential information to the defense of the lawsuit. The Illinois Supreme Court invalidated the statute nonetheless.

**Summary.** Both under the Illinois Constitution and by statute, Illinois law is contrary to, and more stringent than, HIPAA's privacy standards disclosure of patient records in judicial proceedings. Thus, HIPAA's anti-preemption provision provides that Illinois law controls, and the subpoena must be quashed.

**3. The "authorization" order is of no effect in this dispute.** As discussed above at pp. 2-3, before obtaining the subpoena from the Northern District of Illinois, the Attorney General obtained an order from the District Judge in New York hearing *NAF v. Ashcroft,* stating that the Hospital is "authorized" pursuant to HIPAA to comply with the subpoena. It is unclear what that Court intended by this order. It may have simply wanted to help insulate the Hospital from legal attack by patients if it decided to voluntarily comply with the subpoena.

But whatever that Court intended, its order did not determine and could not have determined the issues the Hospital raises on this motion. First, the Hospital is not subject to that Court's jurisdiction or subpoena power. See F.R.Civ.P. 45(b)(2). Second, the Hospital and its patients were given no notice of defendant Ashcroft's request to enter this order, which the Hospital learned of only after it was entered. The Hospital and the patients had no chance to argue about the propriety of this order, and no argument was made to the Court about the propriety of a subpoena for these patients' records. Indeed, the Court entered the HIPAA order before even the plaintiffs in *NAF v. Ashcroft* saw it.

**B. HIPAA Aside, The Records Are Privileged**

Even if HIPAA did not exist, this subpoena would have to be quashed. First, where, as here, confidential medical records are sought of patients with no interest in the lawsuit, and where those records are sought merely to impeach medical testimony offered in that lawsuit, this Court should declare those records privileged from disclosure under federal common law pursuant to F.R.Ev. 501. Second, even if the Court declines to recognize such a privilege as a matter of federal common law, it should exercise its discretion under *Memorial Hospital of McHenry County v. Shadur,* 664 F.2d 1058 (7th Cir. 1981), to follow Illinois law and to quash the subpoena.

**1. *Jaffee* Mandates Recognizing A Privilege In This Case As A Matter Of Federal Common Law**

Under F. R. Ev. 501, the existence of a privilege is governed "by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason

and experience." This flexible rule was chosen because "the common law is not immutable but flexible, and by its own principles adapts itself to varying conditions." *Jaffee v. Redmond,* 518 U.S. 1, 8 (1996) (quotes and citations omitted). Where a privilege "promotes sufficiently important interests to outweigh the need for probative evidence," it should be recognized. *Id.* at 9-10, *quoting Trammel v. United States*, 445 U.S. 40, 47 (1980). This determination should be made on a case-by-case basis. *Jaffee*, at 8.

The privilege at stake in the Attorney General's subpoena is the privilege of confidentiality of communications between patients and their health care providers – in this case, between Dr. Hammond and his patients, as memorialized in the patients' medical records. Although the majority of states recognize some form of this privilege, to date the federal courts have held that there is no universal physician-patient privilege under federal common law. *See Patterson v. Caterpillar*, 70 F.3d 503, 506 (7th Cir. 1995); Stephen Aaron Silver, *Beyond Jaffee v. Redmond: Should the Federal Courts Recognize a Right to Physician-Patient Confidentiality?*, 58 Ohio St.L.J. 1809 (1998) (arguing that in light of *Jaffee,* a federal physician-patient privilege should be recognized).

However, in specific health-care contexts, this privilege can and does exist. *Jaffee* recognized such a privilege in the context of confidential communications with psychotherapists. *Jaffee* was a §1983 suit against a police officer who killed plaintiff's decedent. The plaintiff sought access to notes of the officer's counseling sessions with her psychotherapist. The Supreme Court held these conversations and notes privileged under F.R.Ev.501. Four considerations of "reason and experience" persuaded the Court that the privilege promoted important interests that outweighed the need for the evidence. First, the evidentiary benefit

resulting from denial of the privilege was "modest." 518 U.S. at 11. Second, successful psychotherapy is dependent on preserving an "atmosphere of confidence and trust." *Id.* at 10. Third, where the disclosure of the "sensitive nature of the problems . . . may cause embarrassment or disgrace," the patient must be assured that his or her communications are privileged. *Id.* Fourth, the privilege serves the public interest in providing and encouraging the treatment of mental health problems. *Id.* at 11.

The reasoning of *Jaffee* clearly requires a finding of privilege in the present context, where a litigant seeks the confidential medical records of nonparty patients, on the possibility that those records might impeach the other side's medical testimony in the lawsuit. All four factors cited in *Jaffee* argue for the privilege in such a context.

1. The evidentiary value of the women's medical records in this context is not just "modest," as in *Jaffee,* but essentially nonexistent.

The Hospital knows of no case in America that has held that a litigant, by offering a physician's expert medical testimony, opens the door to subpoena of the physician's nonparty patients' confidential medical records for purposes of impeaching the physician. In hundreds of trials every day in America, litigants can and do effectively contest the testimony of medical experts without having recourse to the patient records of the testifying physician.

The present case illustrates this fact. Examination of the categories of statement in Dr. Hammond's Declaration shows that the medical records of his patients that the Attorney General has subpoenaed will be of little or no value in impeaching him.

(a) Dr. Hammond declared that certain of his patients had particular medical problems that threatened their health if their pregnancies proceeded to term. Ex. C, ¶6. The

only conceivable use of the medical records as to these statements is to suggest that Dr. Hammond is lying – that he did not really have patients with these problems. But no one seriously suggests that pregnant women never develop leukemia, HELLP syndrome, breast cancer, or the other problems Dr. Hammond describes his patients as having. Moreover, the Attorney General's discovery requests to Dr. Hammond limited the universe of patients, for the most part, to patients treated in 2003. Ex. D. The inability by Dr. Hammond to produce a record of a particular patient would therefore not impeach Dr. Hammond's Declaration. It would only show that he had no such patient in 2003.

(b) Dr. Hammond describes circumstances in which fetal abnormalities threatened catastrophic results to the child if the pregnancies proceeded to term. *Id.,* ¶5. This is an uncontrovertible proposition, accepted by proponents and opponents of abortion alike. The patients' medical records will not help the Attorney General impeach this testimony.

(c) In the course of discussing why he is uncertain whether the procedures he performs are covered by the text of the PBABA, Dr. Hammond gives extensive details of what happens to the fetus during a second-trimester abortion. *Id.,* ¶¶11-21, 26-31. His patients' medical records are highly unlikely to impeach this description. First, it is based on largely undisputed anatomy. In *Carhart,* the Supreme Court gave a lengthy description of the anatomy of second trimester abortions which closely tracks Dr. Hammond's description. 530 U.S. at 923-929. Second, operating reports in medical records rarely go into the kind of analysis Dr. Hammond's Declaration contains. Third, if Dr. Hammond's description of the anatomy of abortion is wrong, the Attorney General can easily rebut it by calling his own experts.

2. As in *Jaffee,* recognizing the privilege here is necessary to protect trust and

confidence between patient and physician. If the privilege is denied in the present context, then every physician who provides expert medical testimony in a judicial proceeding risks subpoena of the medical records of patients who have no interest in that proceeding. If such subpoenas become common practice, the erosion of patient trust in their physicians will be significant indeed. The danger to physician-patient confidence seems especially acute in the context of the painful decision to have a second-trimester abortion. As *Jaffee* pointed out, treatment by a physician for a "physical ailment" is often a routine process with an objective evaluation. *Id.* at 10. But there is nothing routine about abortion, and particularly the decision to abort in the second trimester. The decision to abort in these circumstances inevitably involves overwhelming emotional issues requiring the utmost confidence in one's physician.

3. *Jaffee*'s concern about "embarrassment and disgrace" that might accompany disclosure is also present here, both as a general matter and in the present case. As a general matter, most patients would be embarrassed at the use of their confidential medical records in public trials in which they have no interest whatsoever. In the specific context of abortion procedures, this factor becomes even more acute. Given how controversial abortion still is, a woman contemplating an abortion procedure faces a significant risk of embarrassment and hostility. The controversy and resulting passions are at their most heated with second-trimester abortions, as the PBABA illustrates.

4. Just as the privilege in *Jaffee* promoted the provision of mental health treatment by protecting patients' confidence in their therapists, the privilege in this case facilitates the provision of needed health services by protecting the same confidence in their physicians. Again, if subpoenas of physician witnesses' patients' records become common practice, there is certain

to be a chilling effect on the willingness of patients to consult physicians about intimate problems of any kind.

This potentially serious deterrent effect cannot be avoided by a promise of redacting patients' names from their records. If patients know their medical records may be used in lawsuits in which they will be nonparticipants, they simply will not trust unfamiliar courts, litigants, and lawyers to keep their identities confidential. Almost no one wants his or her confidential medical records used in other people's public lawsuits, whether the records are redacted or not.

In short, all four considerations that led the Supreme Court in *Jaffee* to hold the notes of psychotherapeutic treatment privileged under Rule 501 are present in the context of a subpoena that seeks nonparties' medical records for purposes of impeaching medical testimony provided by their physician.

Moreover, three additional factors not present in *Jaffee* argue for the privilege in this case. First, the Supreme Court has recognized a constitutional right to abortion, and locates this right in the right to *privacy*. Any weakening of the privacy of abortion patients is therefore constitutionally suspect.

Second, unlike in *Jaffee,* these women's records are being sought in connection with a lawsuit to which they are strangers. It is one thing to sacrifice privacy for the sake of resolving a suit in which one is a party. But these women have no interest in this suit. Any fair conception of privacy includes being allowed to keep one's intimate medical history from being used in other persons' disputes.

Third, not recognizing the privilege has an additional disturbing implication that was not

present in *Jaffee*: the potential to deter physicians from offering medical expert testimony in court proceedings. Every day in American courtrooms, physicians, whether parties or retained experts, give expert testimony – in medical malpractice case, drug product liability cases, FDA regulation litigation, and many other kinds of lawsuits. Until now, no one has maintained that such testimony opens the door to subpoena of their nonparty patients' confidential medical records. But the Attorney General states exactly that. If he is right, many physicians will become reluctant to give such testimony. They will not subject their patients to such intrusions into their privacy.

**Summary.** Both the *Jaffee* considerations and additional ones argue for recognizing a privilege under federal common law for confidential medical records of patients who have no interest in the lawsuit and where the records are sought to impeach the medical expert testimony of the patients' physician.

### C. This Court Has Discretion To Apply Illinois Law To Bar Disclosure

As discussed at pp. 7-11 above, Illinois law protects these medical records from disclosure in a lawsuit to which the patients are not parties. Even if this Court declines to hold the subpoenaed records privileged under federal common law, the Court may still apply Illinois law and quash the subpoena. *Memorial Hospital for McHenry County v. Shadur*, 664 F.2d 1058, 1060-1061 (7th Cir. 1981). In *Shadur*, the Seventh Circuit wrote that "where a 'state holds out the expectation of protection to its citizens, they should not be disappointed by a mechanical and unnecessary application of the federal rule.'" Accordingly, in federal cases with federal claims, "a strong policy of comity between state and federal sovereignties impels federal courts to

recognize state privileges where this can be accomplished at no substantial cost to federal substantive and procedural policy." 664 F.2d at 1061, *quoting United States v. King*, 73 F.R.D. 103, 105 (E.D.N.Y. 1976) In applying this principle, a federal court should "weigh the need for truth against the importance of the relationship or policy sought to be furthered by the privilege, and the likelihood that recognition of the privilege will in fact protect that relationship in the factual setting of the case." *Shadur,* 664 F.2d at 1060-1061, *quoting Ryan v. Commissioner,* 568 F.2d 531, 543 (7th Cir. 1977), *cert. denied*, 439 U.S. 820 (1978).

Under this principle, "many federal courts have applied state privilege law after satisfying themselves that the state principle at issue did not conflict with, or outweighed, federal policy." *Johnson v. Nyack Hospital,* 169 F.R.D. 550, 557 (S.D.N.Y. 1996) (citing cases).

*Shadur* has been applied in this District to quash a subpoena for medical records of patients who are strangers to the lawsuit. In *Spurgeon Green v. Silver Cross Hospital*, 1985 WL 1463 (N.D. Ill. 1985), a race discrimination case, the defendant subpoenaed a nonparty hospital to produce medical records of patients considered in connection with any peer review of the plaintiff there. The Court employed the balancing test from *Shadur* and held that the balance tipped heavily against enforcement of the subpoena. In so holding, the Court noted that the "nonproduction of patient treatment records serves (1) to promote full disclosure between physician and patient, thus ensuring the best possible treatment, and (2) to protect the patient 'from the embarrassment and invasion of privacy that disclosure would entail.'" *Id.* at *2, *citing People v. Herbert*, 108 Ill.App.3d 143, 149, 438 N.E.2d 1255, 1259 (1st Dist. 1982). On the other side of the scale, the defendant failed to show the relevance of the subpoenaed documents to its defense. *Spurgeon Green*, at *2.

Pursuant to *Shadur*, this Court should apply Illinois' bar against disclosure of these records. As discussed above, the evidentiary value of these records to impeach Dr. Hammond is almost surely nonexistent. In contrast, the Illinois policy against disclosure of confidential medical information is extremely strong. It has been declared a *constitutional* policy by the State's highest court – something no other American jurisdiction known to the Hospital has done. And it is harder to think of a more compelling context to provide confidentiality than the present one, where the procedures at issue consist of second-trimester abortions and the patients are strangers to the lawsuit.

## II. PRODUCTION OF THESE RECORDS IS AN "UNDUE BURDEN" ON THE PATIENTS AND THE HOSPITAL

Even if the records are not privileged, F.R.Civ. 45(c)(3)(A)(iv) requires this Court to quash any subpoena that imposes "an undue burden on any person." By using the term "any person," the Rule makes clear that the person need not be the recipient of the subpoena. The term "undue burden" is not limited to logistical difficulties of complying with the subpoena. For example, an invasion of privacy of nonparties can constitute an "undue burden." *Miscellaneous Docket Matter #1 v. Miscellaneous Docket Matter #2,* 197 F.3d 922, 927 (8th Cir. 1999).

Such is the case here. The Attorney General's subpoena is an unacceptable intrusion into the privacy of the Hospital's patients, promising no significant contribution to the ascertainment of truth in *NAF v. Ashcroft*.

Moreover, the subpoena also threatens an undue burden on the Hospital. Maintaining the trust and confidence of its patients is critical to any hospital. When these patients sought treatment at the Hospital, they could not have expected that their Hospital would turn their most

intimate medical records over to the Attorney General for use in a public lawsuit. These patients will be angered if this subpoena is enforced, and many of them will inevitably blame the Hospital. These laypersons will not distinguish between the Hospital and Dr. Hammond, or accept that the Hospital had nothing to do with Dr. Hammond's decision to join as a plaintiff in *NAF v. Ashcroft.* The resulting damage to the Hospital's reputation and its patients' trust is an "undue burden" that requires the subpoena to be quashed.

## CONCLUSION

The Hospital respectfully requests that its Motion To Quash be granted.

Respectfully submitted,

George F. Galland, Jr.
Attorney for Northwestern
Memorial Hospital

George F. Galland, Jr.
Nancy L. Maldonado
MINER, BARNHILL & GALLAND, P.C.
14 W. Erie Street
Chicago, IL 60610
(312) 751-1170

Date: January 6, 2004

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**NATIONAL ABORTION FEDERATION; MARK I. EVANS, M.D.; CAROLYN WESTHOFF, M.D., M.Sc.; CASSING HAMMOND, M.D.; MARC HELLER, M.D.; TIMOTHY R.B. JOHNSON, M.D.; STEPHEN CHASEN, M.D.; GERSON WEISS, M.D.**, on behalf of themselves and their patients,

Plaintiffs,

v.

**JOHN ASHCROFT**, in his capacity as Attorney General of the United States, along with his officers, agents, servants, employees, and successors in office,

Defendant.

____ Civ. _______ ( )

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Plaintiffs, by and through their undersigned attorneys, bring this Complaint against the above-named Defendant, his employees, agents, and successors in office, and in support thereof state:

**PRELIMINARY STATEMENT**

This action, arising under the United States Constitution, challenges the constitutionality of the "Partial-Birth Abortion Ban Act of 2003," United States Senate Bill No. 3 (to be codified at 18 U.S.C. § 1531) (the Act). The legislation was sent to the President on October 28, 2003. The President intends to sign the Act into law tomorrow, November 5, 2003. See Office of Communications, The White House, *The Week Ahead: Monday, November 3, 2003, through*

EXHIBIT
A

*Friday, November 7, 2003*, 2003 WL 22465881, at *1 (Oct. 31, 2003) ("Wednesday, November 5[, at] . . . 1:40 pm[,] THE PRESIDENT signs S.3, the Partial Birth Abortion Act of 2003"). Absent relief from this Court, the law will take effect at 12:01 am on Thursday, November 6, 2003. A copy of the Act is attached as Exhibit 1.

1. Plaintiffs seek declaratory and injunctive relief against the Act, which on pain of criminal penalty bans what Congress calls "partial-birth abortions." Unless this Court grants such relief, Plaintiffs will risk severe criminal penalties for continuing to provide safe abortion procedures prior to fetal viability in accordance with their best medical judgment.

2. The Act contains, *inter alia*, the same two constitutional defects that led the Supreme Court to strike down Nebraska's "partial-birth abortion" ban in Stenberg v. Carhart, 530 U.S. 914 (2000). First, like Nebraska's ban, the Act lacks any exception to protect women's health, and thus affirmatively endangers pregnant women. Second, like Nebraska's ban, the Act establishes criminal sanctions for performing the safe and common abortion procedure that is used for over 90 percent of abortions after the first trimester. The Act therefore imposes an undue burden on the right of a woman to choose abortion prior to fetal viability. Far from addressing the constitutional requirements set forth in Stenberg, the Act is a blatant attempt by Congress to challenge and overturn the Supreme Court's decision. See Act § 2(3)-(14). The Act is unconstitutional, in addition, because its exception to protect women's lives is grossly inadequate; it is vague and fails to give fair warning of what actions will subject physicians to imprisonment; it serves no legitimate state interest; and it discriminates against women in violation of the Equal Protection Clause. The Act thus violates rights guaranteed to Plaintiffs and their patients by the United States Constitution.

## JURISDICTION AND VENUE

3. This case arises under the Constitution and laws of the United States and presents a federal question within this Court's jurisdiction under Article III of the Constitution and 28 U.S.C. § 1331.

4. Declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202; by Rules 57 and 65 of the Federal Rules of Civil Procedure; and by the general legal and equitable powers of this Court.

5. The Court has the authority to award costs and attorneys' fees under 28 U.S.C. § 2412.

6. Venue is proper under 28 U.S.C. § 1391(e).

## PARTIES

### Plaintiffs

7. Plaintiff National Abortion Federation ("NAF") is a not-for-profit Missouri corporation with its principal place of business in the District of Columbia. NAF is the professional association of abortion providers in the United States and Canada. NAF's membership includes over 350 health care facilities in 47 states, as well as individual members. NAF's members provide over half the induced abortions performed in this country. Among its members are physicians performing abortions in compliance with the laws of their respective states and using methods threatened by the Act's broad proscription, including dilation and evacuation (D&E) – including the intact D&E variation – and induction. In addition to using these methods for induced abortions – that is, abortions initiated by a medical provider – some NAF members also use these methods to complete spontaneous abortions (miscarriage). Among

NAF members are physicians who work and/or reside in New York County. NAF's members reasonably fear criminal prosecution under the Act, as well as disciplinary action by state regulatory authorities. NAF sues on behalf of itself; its current and future members that perform, supervise, teach, provide training in, or participate in abortion services after the first trimester; and those members' patients.

8. Plaintiff Mark I. Evans, M.D., is a physician licensed to practice in the State of New York. He is Director of the Institute for Genetics and Fetal Medicine at St. Luke's-Roosevelt Hospital Center in New York County. In this capacity, Dr. Evans directs a large prenatal diagnosis program and one of the few centers for fetal therapy in the world. Dr. Evans is board-certified in clinical genetics and in obstetrics and gynecology. He is a fellow of the American College of Obstetricians and Gynecologists. Dr. Evans provides his patients with an array of services, including prenatal care, fetal diagnosis, and fetal therapy. When performing, supervising, and teaching induced abortions and treatment of spontaneous abortions, Dr. Evans uses procedures threatened by the Act's broad proscription, including D&E and induction. Dr. Evans reasonably fears criminal prosecution under the Act, as well as disciplinary action by state regulatory authorities. Dr. Evans sues on behalf of himself and his patients.

9. Plaintiff Carolyn Westhoff, M.D., is a physician licensed to practice in the State of New York. She is Professor of Obstetrics and Gynecology at the College of Physicians and Surgeons of Columbia University in New York County, and Professor of Public Health (Epidemiology and Population and Family Health) at the Mailman School of Public Health, also of Columbia University. She is also an Attending Physician, the Medical Director of Special GYN Services, and the Medical Director of the Family Planning Clinic at New York Presbyterian

– Columbia Presbyterian Medical Center in New York County, where she resides. Dr. Westhoff is board-certified in obstetrics and gynecology. Through her private practice in New York County, Dr. Westhoff is a member of NAF. She is also a fellow of the American College of Obstetricians and Gynecologists. Dr. Westhoff provides, supervises, and teaches a range of gynecologic services including family planning services, abortions, treatment for sexually transmitted diseases, and other reproductive health care. When performing, supervising, and teaching induced abortions and treatment of spontaneous abortions, she uses procedures threatened by the Act's broad proscription, including D&E and the intact D&E variation. She reasonably fears criminal prosecution under the Act, as well as disciplinary action by state regulatory authorities. Dr. Westhoff sues on behalf of herself and her patients.

10. Plaintiff Cassing Hammond, M.D., is a registered and licensed physician in Illinois. He is an Assistant Professor of Obstetrics and Gynecology at Northwestern University School of Medicine and Faculty Foundation and an Attending Physician at Northwestern Memorial Hospital in Chicago. He is actively engaged in the practice of obstetrics and gynecology, in which he is board-certified. He is a member of NAF. He is also a fellow of the American College of Obstetricians and Gynecologists. Dr. Hammond provides a full range of obstetric and gynecologic care, including prenatal care, labor and delivery, and induced abortions, with a special focus on providing gynecologic and obstetric care to women with disabilities. When performing, supervising, and teaching induced abortions and treatment of spontaneous abortion and other pregnancy loss, Dr. Hammond uses procedures threatened by the Act's broad proscription, including D&E – including the intact D&E variation – and induction.

Dr. Hammond reasonably fears criminal prosecution under the Act, as well as disciplinary action by state regulatory authorities. Dr. Hammond sues on behalf of himself and his patients.

11. Plaintiff Marc Heller, M.D., is a physician licensed to practice medicine in the State of New York. He is board-certified in obstetrics and gynecology. Dr. Heller is a member of NAF. He is also a fellow of the American College of Obstetricians and Gynecologists. Dr. Heller provides his patients a full range of obstetric and gynecologic care, including prenatal care, delivery, gynecologic surgery, and abortions. When performing, supervising, and teaching induced abortions and treatment of spontaneous abortions, Dr. Heller uses procedures threatened by the Act's broad proscription, including D&E. He reasonably fears criminal prosecution under the Act, as well as disciplinary action by state regulatory authorities. Dr. Heller sues on behalf of himself and his patients.

12. Plaintiff Timothy R.B. Johnson, M.D., is licensed to practice medicine in the State of Michigan. Dr. Johnson is Professor and Chair of the Department of Obstetrics and Gynecology, Bates Professor of the Diseases of Women and Children, Research Scientist in the Center for Human Growth and Development, and Professor of Women's Studies, all at the University of Michigan. He is board-certified in obstetrics and gynecology and in maternal-fetal medicine. He is a fellow of the American College of Obstetricians and Gynecologists. As Chair of the Department of Obstetrics and Gynecology at the University of Michigan, Dr. Johnson oversees the provision of a full range of obstetric and gynecologic care, including prenatal care, fetal diagnoses, labor and delivery, and abortions. When performing, supervising, and teaching induced abortions and treatment of spontaneous abortions, he uses procedures that are threatened by the Act's broad proscription, including D&Es and inductions. Dr. Johnson reasonably fears

criminal prosecution under the Act, as well as disciplinary action. Dr. Johnson sues on behalf of himself and his patients.

13. Plaintiff Stephen Chasen, M.D., is a physician licensed to practice in the State of New York. He is Director of High-Risk Obstetrics and Assistant Professor of Obstetrics and Gynecology at New York Presbyterian Hospital – New York Weill Cornell Medical Center in New York County, where he resides. He is actively engaged in the practice of obstetrics and gynecology and maternal-fetal medicine, and is board-certified in both of those practice areas. He is a fellow of the American College of Obstetricians and Gynecologists. Dr. Chasen provides a broad range of services, including prenatal care, fetal diagnosis, labor and delivery, and abortion procedures. When performing, supervising, and teaching induced abortions and treatment of spontaneous abortions, Dr. Chasen uses procedures threatened by the Act's broad proscription, including D&E – including the intact D&E variation – and induction. Dr. Chasen reasonably fears criminal prosecution under the Act, as well as disciplinary action by state regulatory authorities. Dr. Chasen sues on behalf of himself and his patients.

14. Plaintiff Gerson Weiss, M.D., is a physician licensed to practice medicine in the State of New Jersey. He is Professor and Chair of the Department of Obstetrics, Gynecology and Women's Health at New Jersey Medical School, and Chief of Service of the Department of Obstetrics and Gynecology at University Hospital, both components of the University of Medicine and Dentistry of New Jersey (UMDNJ) in Newark, New Jersey. He is also the Director of the Center for Reproductive Medicine, which is affiliated with Hackensack Hospital. Dr. Weiss is board-certified in obstetrics and gynecology; has a subspecialty board certification in reproductive endocrinology; and resides in New York County He is a fellow of

the American College of Obstetricians and Gynecologists. As Chair and Chief of Service of the Department of Obstetrics and Gynecology at UMDNJ, Dr. Weiss oversees the provision of all obstetric and gynecologic care at the hospital, including abortions. He also established the training program and teaches residents to perform the full range of obstetric and gynecologic care. When performing, supervising, and teaching induced abortions and treatment of spontaneous abortions, Dr. Weiss uses procedures threatened by the Act's broad proscription, including D&E and induction. Dr. Weiss reasonably fears criminal prosecution under the Act, as well as disciplinary action. Dr. Weiss sues on behalf of himself and his patients.

**Defendant**

15. Defendant John Ashcroft is the Attorney General of the United States, with authority to enforce federal criminal laws, including the Act, in the United States. Defendant Ashcroft is sued in his official capacity, as are his officers, agents, servants, employees, and successors in office.

16. Defendant acts under color of federal law when enforcing federal statutes such as the Act.

**FACTS**

**The Act**

17. The Act prohibits any physician in the United States from, "in or affecting interstate or foreign commerce, knowingly perform[ing] a partial-birth abortion." 18 U.S.C. § 1531(a). The Act defines a "partial-birth abortion" as

> an abortion in which the person performing the abortion (A) deliberately and intentionally vaginally delivers a living fetus until, in the case of a head-first presentation, the entire fetal head is outside the body of the mother, or, in the case of breech

> presentation, any part of the fetal trunk past the navel is outside the body of the mother for the purpose of performing an overt act that the person knows will kill the partially delivered living fetus; and (B) performs the overt act, other than completion of delivery, that kills the partially delivered living fetus.

Id. § 1531(b)(1).

18. The Act's prohibition of "partial-birth abortions" applies regardless of the stage of the pregnancy and regardless of whether the fetus is viable. The Act's definition of "partial-birth abortion" neither specifies that the fetus be removed intact, nor defines what qualifies as an "overt act." The Act also fails to exempt any specific abortion methods. On its face, the language of the ban applies to both induced abortion and spontaneous abortion or other pregnancy loss (miscarriage).

19. Violation of the Act is a felony, which subjects a physician to a sentence of imprisonment of not more than two years, and/or a fine of not more than $250,000 in the case of an individual and not more than $500,000 in the case of an organization. Id. § 1531(a); see 18 U.S.C. § 3571(b)(3), (c)(3).

20. Conviction under the Act may also deprive physicians of the ability to practice medicine. For example, under the laws and regulations of various states, physicians who are convicted of a felony are subject to disciplinary action, including but not limited to revocation or suspension of their medical licenses.

21. The Act also provides for civil liability. Section 1531(c)(1) allows the putative "father" of the fetus (if he is married to the woman) or the putative "maternal grandparents of the fetus" (if the woman has not attained the age of 18) to "obtain appropriate relief" in a civil action, "unless the pregnancy resulted from the plaintiff's criminal conduct or

the plaintiff consented to the abortion." 18 U.S.C. § 1531(c)(1) The relief may include "(A) money damages for all injuries, psychological and physical, occasioned by the violation of [the Act], (B) and statutory damages equal to three times the cost of the partial-birth abortion." Id. § 1531(c)(2).

22. The Act contains no exception to protect women's health.

23. The Act's single, narrow exception to its broad ban applies only when a banned procedure "is necessary to save the life of a mother whose life is endangered by a physical disorder, physical illness, or physical injury, including a life-endangering physical condition caused by or arising from the pregnancy itself." Id. § 1531(a).

24. Under federal law establishing accessory and accomplice liability, physicians, other medical staff, non-medical staff, and facilities involved in Plaintiffs' procedures that are threatened by the Act are also subject to liability.

**Abortion Practice**

25. Induced abortion is one of the safest surgical procedures. Abortion has both a lower morbidity (non-fatal complication) rate and a lower mortality (death) rate than carrying a pregnancy through childbirth.

26. The rates of abortion-related morbidity and mortality increase, however, as the pregnancy advances.

27. Almost ninety percent of induced abortions performed in the United States occur during the first trimester, prior to approximately thirteen weeks of pregnancy as measured from the first day of the last menstrual period (hereinafter LMP).

28. Plaintiffs' patients seek abortions for a wide range of deeply personal reasons. Some women end pregnancies that cause or aggravate dangerous medical conditions; others end pregnancies when they learn that the fetuses they are carrying have severe anomalies; some end pregnancies that result from rape or incest; others end unplanned pregnancies because of their age, their family situation, and their marital and financial status. Plaintiffs' patients also include women needing treatment for spontaneous abortion (miscarriage).

29. While pregnancy presents medical risks for all women, the risks are particularly significant for women with preexisting health conditions, including hypertension, heart disease, renal and liver disease, and diabetes. Even in women without preexisting conditions, pregnancy can cause serious or life-threatening conditions, such as severe preeclampsia or eclampsia, which is characterized by convulsions and comas. Such health conditions often emerge or are exacerbated after the first trimester of pregnancy.

30. Many women end wanted pregnancies when they learn that the fetuses they are carrying have severe anomalies. Such anomalies are often diagnosed during the second trimester. Some anomalies are sure to be fatal within days, if not minutes, of birth; other conditions might permit survival but cause severe, life-long impairment and death during childhood. Many women carrying fetuses with such conditions choose to terminate their pregnancies rather than give birth only to watch their children suffer and die.

**Abortion Procedures**

31. The safest and most appropriate abortion procedure for any given woman depends on a range of factors, including the stage of pregnancy; the woman's health; any medical contraindications; the physician's training, skill, and experience; the woman's prior surgical history; the woman's desire to preserve her future fertility; and the need to remove the fetus intact to permit more complete pathological testing.

32. Depending on this range of factors, physicians may use any of the following methods to terminate a pregnancy: early medical abortion; suction curettage; dilation and evacuation ("D&E") (of which there are variations, including "intact D&E"); induction (of which there are variations); hysterotomy; and hysterectomy. With the exception of hysterotomy and hysterectomy, these are all safe, routine, common procedures.

33. The precise way in which each of these methods is performed varies from physician to physician and from patient to patient.

34. The vast majority of first-trimester abortions and some early second-trimester abortions are performed with suction curettage (also called vacuum aspiration). In suction curettage, the physician first dilates the cervix (the narrow, lower part of the uterus that opens into the vaginal canal); then inserts a suction cannula through the cervix and into the uterus; and then, with the use of negative suction, extracts the embryo or fetus and other products of conception.

35. Early medical abortion is also increasingly common, although it currently accounts for less than a quarter of first-trimester abortions. Generally available only until seven

to nine weeks LMP, it involves administering medications such as mifepristone (RU-486) that terminate the pregnancy.

36. After the first trimester, more than ninety-five percent of induced abortions are performed with the dilation and evacuation method ("D&E"). In a D&E, the physician first dilates the cervix and then evacuates the uterus using a combination of forceps, suction, and curettage. This often results in the disarticulation of the fetus, although sometimes the fetus is removed largely intact. Like all surgery, D&E is infinitely variable.

37. Whatever the exact progression of the surgery, each time the physician inserts the forceps into the uterus, he or she hopes to deliver as much of the fetus as possible, as this minimizes the number of insertions and thus minimizes the risks for the woman. In any D&E, the physician may be able to remove the fetus largely intact, which minimizes instrumentation.

38. Intact D&E (which is also known as intact dilation and extraction or D&X) is one variation of the D&E procedure, generally used after nineteen weeks LMP, that is intended to maximize the chances of an intact or relatively intact delivery, and thereby to minimize risk to the woman. Delivering the fetus intact – whether or not the physician uses the intact D&E variation – can be the safest way to perform a D&E. It can, for example, reduce the risk of uterine perforation and cervical laceration, and also reduce blood loss and operating time.

39. The main alternative to a D&E procedure after the first trimester is the induction method of abortion. In an induction, the physician uses one of several different medications to induce pre-term labor. This induced labor entails all the pain, trauma, and potential complications of labor and delivery at full term, and may be contraindicated for some

women. Some inductions fail or entail particular complications, requiring the physician to complete the procedure using the surgical techniques of D&E.

40. Other than D&E and induction, the only other post-first-trimester abortion procedures are hysterotomy and hysterectomy. They are appropriate abortion methods only in very rare circumstances, as both constitute major abdominal surgery. Hysterotomy is similar to a cesarean section except that, in the second trimester, it is significantly more dangerous than a cesarean section at term. Hysterectomy is the removal of the uterus, which results in complete loss of fertility. Hysterectomy and hysterotomy entail significantly higher rates of morbidity and mortality than are associated with either D&E or induction.

**The Effects of the Act on Women's Health and Access to Abortion**

41. The term "partial-birth abortion" is not a medical term and does not describe any particular abortion procedure. Rather, as defined in the Act, the term "partial-birth abortion" could encompass a range of safe abortion procedures, including D&Es of all variations and inductions of all variations, whether used to perform induced abortions or to treat spontaneous abortion.

42. Whether used as induced abortions or to complete spontaneous abortions, any D&E (including any intact D&E) and any induction can include the steps defined as criminal in the Act's broad ban:

a. In any of these procedures, the physician may deliver outside the woman's body the portion of the fetus specified in the Act before fetal demise occurs, and then perform an "overt act, other than

completion of delivery," that is lethal to the fetus. Numerous "overt acts" could trigger the ban, including disjoining or severing a fetal part, and collapsing a fetal part, such as the skull or the abdomen, to reduce its size and allow it to pass through the cervix.

b. Whenever using any of these procedures, the physician acts deliberately and intentionally -- both in removing the fetus until the specified portion is outside the woman, and in committing the "overt act." This is because every act in an abortion procedure is deliberate and intentional, and performed knowingly, with awareness of the nature of the conduct.

c. Whenever using any of these procedures, the physician's purpose in removing the specified portion of the fetus – and in performing every step of the abortion – is to empty the uterus as safely as possible for the woman. The purpose is not to commit any particular "overt act." In beginning any of these procedures, however, the physician knows that the safest way to proceed may turn out to be performing a lethal "overt act" that triggers the ban.

43. With its vague, non-medical language and apparently vast reach, the Act fails to give physicians fair warning as to exactly what conduct is prohibited, forcing them to guess whether the safest procedure for a given patient will expose them to prosecution. The Act is completely vague as to when performance of a banned abortion is "in or affecting interstate or foreign commerce."

44. Because of the Act's vagueness, prosecuting attorneys may differ widely over what conduct they believe is banned. The Act thus subjects physicians and others who participate in threatened procedures to arbitrary and discriminatory prosecution.

45. The Act is all the more dangerous because it contains no health exception and only a grossly inadequate life exception. The exception applies only if a banned procedure is "necessary to save the life of a mother whose life is endangered by a physical disorder, physical illness, or physical injury, including a life-endangering physical condition caused by or arising from the pregnancy itself." A banned procedure is thus still criminal even when it is the safest procedure; is necessary to protect a woman's health; or is necessary to save a woman's life because of a threat posed by other than a physical disorder, physical illness, or physical injury. In addition, because the Act exempts only a procedure that is "necessary" to save the woman's life, it mandates the use of any alternative procedure that would save her life, even if it would be more dangerous to her health or render her infertile. The Act also fails to specify a *mens rea* standard for the determination that a procedure is "necessary" to save the woman's life. This failure leaves physicians at risk in relying on their own best medical judgment and thus will chill further their provision of lifesaving medical care.

46. The Act exposes to criminal liability not only Plaintiffs and the members of Plaintiff NAF, but also their officers, agents, servants, and employees; the individuals, including non-medical staff, with whom they work, whom they teach, or whose work they supervise in providing threatened procedures; and the facilities at which they perform, teach, or supervise threatened procedures. The chill the Act imposes on these individuals and entities also

impedes the ability of Plaintiffs and the members of Plaintiff NAF to practice medicine in their patients' best interest by providing threatened procedures.

47. Because legislation such as the Act endangers women's lives and health, major medical organizations specializing in women's health – including the American College of Obstetricians and Gynecologists – have opposed the Act or its earlier analogs.

**Injunctive Relief**

48. Plaintiffs and their members and patients will suffer irreparable harm if the Act is not enjoined. This harm stems from violations of constitutional rights and from threats to women's health. Plaintiffs and their members and patients have no adequate remedy at law.

49. Enforcement of the Act would force physicians either to face criminal prosecution for continuing to provide abortion care in accordance with their best medical judgment, or to stop performing medically appropriate and necessary procedures that fall within the Act's broad ban. The harms to women include being prevented or delayed in obtaining abortion care, and being exposed to increased medical risk.

**FIRST CLAIM FOR RELIEF**

50. Plaintiffs hereby incorporate by reference Paragraphs 1 through 50 above.

51. By endangering the lives and health of pregnant women, the Act violates women's rights to privacy, liberty, bodily integrity, and procreation guaranteed by the Due Process Clause of the Fifth Amendment.

**SECOND CLAIM FOR RELIEF**

52. Plaintiffs hereby incorporate by reference Paragraphs 1 through 52 above.

53. By prohibiting physicians from performing safe abortions, the Act imposes an undue burden on a woman's right to choose to terminate a pregnancy and thus violates women's rights to privacy, liberty, bodily integrity, and procreation guaranteed by the Due Process Clause of the Fifth Amendment.

**THIRD CLAIM FOR RELIEF**

54. Plaintiffs hereby incorporate by reference Paragraphs 1 through 54 above.

55. By failing to give adequate notice of the procedures it proscribes, and by permitting arbitrary enforcement, the Act is impermissibly vague in violation of the Due Process Clause of the Fifth Amendment.

**FOURTH CLAIM FOR RELIEF**

56. Plaintiffs hereby incorporate by reference Paragraphs 1 through 56 above.

57. By failing to serve any legitimate state interest, the Act violates the Due Process Clause of the Fifth Amendment.

**FIFTH CLAIM FOR RELIEF**

58. Plaintiffs hereby incorporate by reference Paragraphs 1 through 58 above.

59. By endangering the health and lives of women, but not men, the Act violates women's right to equal protection guaranteed by the Fifth Amendment.

WHEREFORE, Plaintiffs ask that this Court

A. Issue temporary, preliminary, and permanent injunctive relief enjoining Defendant, along with his officers, agents, servants, employees, successors, and all others acting in concert or participation with them from enforcing the Act;

B. Enter judgment declaring the Act to be in violation of the United States Constitution;

C. Award reasonable attorneys' fees and costs; and

D. Grant such other and further relief as this Court finds just and proper.

Dated: November 4, 2003

Kimberly A. Parker*
A. Stephen Hut, Jr.*
Wilmer, Cutler & Pickering
2445 M Street, N.W.
Washington, D.C. 20037
(202) 663-6000

Lorie A. Chaiten*
The Roger Baldwin Foundation of ACLU, Inc.
180 N. Michigan Ave., Suite 2300
Chicago, Illinois 60601
(312) 201-9740

Susan Talcott Camp – SC 2949
Julie Sternberg – JS 2523
Louise Melling – LM 4505
Reproductive Freedom Project
American Civil Liberties Union Foundation
125 Broad Street
New York, New York 10004
(212) 549-2633

Rebekah Diller – RD 7791
New York Civil Liberties Union Foundation
125 Broad Street, 17th Floor
New York, New York 10004
(212) 344-3005

* Not admitted in this Court

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

**In the matter of a subpoena issued in the case of**

**NATIONAL ABORTION FEDERATION et al.**

**Plaintiffs,**

**v.**

**JOHN ASHCROFT,**

**Defendant,**

**NORTHWESTERN MEMORIAL HOSPITAL,**

**Movant.**

**DECLARATION OF RACHEL DVORKEN**

RACHEL DVORKEN states under penalty of perjury:

1. I am Senior Associate General Counsel of Northwestern Memorial Hospital (the "Hospital"). I am submitting this Declaration in support of the Hospital's Motion to Quash Subpoena.

2. The Hospital was served on or about December 21, 2003 with a subpoena in a lawsuit entitled *National Abortion Federation et al. v. Ashcroft,* Case No. 03 Civ. 8695 (RCC) (S.D.N.Y.), now pending in the United States District Court for the Southern District of New York.

EXHIBIT B

2. The Hospital, a large teaching institution in Chicago, is not a party to *NAF v. Ashcroft*. The Hospital operates no facilities outside of Illinois.

3. One of the plaintiffs in *NAF v. Ashcroft* is Cassing Hammond, M.D. Dr. Hammond is an obstetrician and gynecologist. He has privileges to practice at the Hospital, but is not employed by the Hospital. Hospital management was unaware of Dr. Hammond's decision to become a plaintiff in *NAF v. Ashcroft* before the lawsuit was filed. The Hospital's only interest in the present matter is to take every appropriate step under federal and Illinois law to protect the privacy of its patients and their medical records. In December 2003, I became aware that Dr. Hammond was a plaintiff in *NAF v. Ashcroft,* and that in connection with a motion for temporary restraining order filed in that lawsuit, Dr. Hammond had submitted a Declaration, which is attached as Exhibit C to the Hospital's Memorandum In Support Of Motion To Quash Subpoena.

4. In December I was provided by Dr. Hammond's counsel with a copy of interrogatories and document requests served by defendant Ashcroft on Dr. Hammond, asking him to identify the patient medical record numbers of each patient who fell within the descriptions in his Declaration, and to produce the patient medical records in question. Dr. Hammond does not have the patient medical records in question; the Hospital does.

5. Sometime after December 18, 2003, I was provided, by counsel for Dr. Hammond, a copy of the order entered by the United States District Judge hearing *NAF v Ashcroft*, Judge Richard Conway Casey, attached as Exhibit D to the Hospital's Memorandum in Support of Motion To Quash Subpoena. This order was issued without notice to the Hospital, which is not a party to *NAF v. Ashcroft*. The Hospital first saw this order after it was entered,

when counsel for Dr. Hammond provided it to us.

6. I have now seen copies of the correspondence between the parties to *NAF v. Ashcroft* which traced how Judge Casey's order of December 18, 2003 came to be entered. This correspondence is attached as Exhibits F, G, H, and I to the Hospital's Memorandum In Support Of Its Motion To Quash Subpoena. The Hospital was not sent, or told about, these letters at the time they were sent. The Hospital was first told about this correspondence, and sent copies of it, by counsel for Dr. Hammond on approximately December 23, 2003.

7. The Hospital was served with the subpoena on approximately December 21, 2003. It retained outside counsel, George F. Galland, Jr., to respond. Mr. Galland then contacted Ms. Gowan and reached a set of understandings embodied in Mr. Galland's letter, attached as Exhibit K to the Hospital's Memorandum In Support Of Motion To Quash Subpoena.

The undersigned states under penalty of perjury and the laws of the United States, that the foregoing is true and correct to the best of her knowledge. Executed in Chicago, Illinois, on January 5, 2004.

Rachel Dvorken

28 U.S.C. §1746.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**NATIONAL ABORTION FEDERATION,** *et al.*,

Plaintiffs,

- against -

**JOHN ASHCROFT**, in his capacity as Attorney General of the United States,

Defendant.

____ Civ. _______ (   )

**DECLARATION OF CASSING HAMMOND, M.D.**

CASSING HAMMOND, M.D., declares and states the following

1. I am a physician licensed to practice in the State of Illinois. I received my M.D. in 1988 from the University of Missouri and did my residency in obstetrics and gynecology at the University of Rochester School of Medicine in New York. I am actively engaged in the practice of obstetrics and gynecology and am board-certified in this practice area. As Assistant Professor in Obstetrics and Gynecology at the Northwestern University School of Medicine in Chicago, I supervise and teach fellows, residents, and medical students. I am also Director of the Northwestern Program in Family Planning and an attending physician at Northwestern Memorial Hospital. I am a Fellow of the American College of Obstetricians and Gynecologists; a member of the National Abortion Federation; and a member of the Association of Professors of Gynecology and Obstetrics. I provide my patients with a broad range of gynecologic and obstetric care, including prenatal care, labor and delivery, and induced abortions. I also have a special

Blumberg No. 5208
EXHIBIT
C

focus on providing gynecologic and obstetric care to women with disabilities. I consider induced abortions an important part of the comprehensive care that I offer my patients and that I teach. I supervise the provision of all abortion services for patients in both Northwestern Memorial's Maternal-Fetal Medicine Department (which handles high-risk, medically complicated pregnancies) and its general Obstetrics & Gynecology Department. A copy of my curriculum vitae is attached hereto as Exhibit A.

2. I submit this declaration in support of Plaintiffs' Motion for a Temporary Restraining Order and a Preliminary Injunction. I submit this declaration as an expert in obstetric and gynecologic procedures, including abortions. It is my professional opinion that the Partial-Birth Abortion Ban Act of 2003 (the Act) will cause severe harm to women and physicians. The Act will dangerously limit physicians' discretion to tailor abortion treatment in light of each particular patient's circumstances. The Act's ban is vague and broad, failing to describe any particular medical procedure; what it does describe is actions that physicians take every day in performing safe abortion procedures. Under the Act, physicians will be at risk of prosecution when performing the most common methods used during the second trimester of pregnancy (between approximately twelve and twenty-four weeks as measured from the first day of the woman's last menstrual period (LMP)). The Act will compel physicians to abstain from performing these abortions in order to avoid criminal penalties; it will thwart women's access to abortions; and it will endanger the health and lives of women in need of a broad range of medical care. I provide abortion care for women with high-risk pregnancies, that is, with medical complications. For that reason, I am particularly disturbed by the Act's lack of any exception for procedures necessary to preserve a woman's health, and by its inclusion of a dangerously narrow

exception for procedures necessary to preserve a woman's life.

Abortion Practice

3. I have performed abortions since 1988, when I started my residency. Currently, I perform, teach, and supervise at least three hundred abortions per year. I teach my students, residents, and fellows all the abortion methods I use. I perform abortions up to twenty-four weeks LMP, which is roughly consistent with the earliest point of viability in healthy pregnancies. I perform abortions only where the fetus is not viable, meaning that it cannot survive outside the woman.

4. Because of my particular training and skills, Northwestern Memorial's Maternal-Fetal Medicine Department refers to me all its patients in need of abortion services. Particularly where patients require abortion services after nineteen to twenty weeks LMP, I also receive referrals from the maternal-fetal medicine departments of hospitals throughout the region, including Evanston Northwestern (which is affiliated with Northwestern Memorial). These patients include women who are ending wanted pregnancies after learning that their fetuses have anomalies that are often quite severe; women who must end pregnancies in order to preserve their health; and women experiencing pregnancy loss, which in lay terms is sometimes called miscarrying. In all of these cases, abortion is a critical component of the broad range of medical services I provide. For our patients' sake, the treatment that I and other physicians offer must include all medically indicated courses of action.

5. The fetal anomalies that lead many of my patients to terminate their pregnancies are often potentially fatal and utterly tragic. These are generally much wanted pregnancies, and

the diagnoses are a devastating blow for my patients. For example, I have performed abortions where, if the pregnancy continued, the fetus would die before the onset of labor or within the first year of life because of Trisomy 13 or Trisomy 18, grave chromosomal anomalies associated with multiple physical anomalies and profound mental retardation. Anencephaly and other severe neural tube defects are also fetal conditions that I see recurrently and that have grave consequences. Fetuses with anencephaly have cranial anomalies characterized by markedly defective development of the brain and skull that results in death before birth or soon thereafter. In addition, patients suffering from severe oligohydramnios, where loss of amniotic fluid results in grave consequences for the fetus, will often seek abortion services. The fetal anomalies that lead my patients to seek abortion services also include other potentially fatal major brain anomalies; absence of extremities; lack of kidney function; and conjoined twin and conjoined triplet fetuses.

6. Other patients require abortions to protect their health. I remember one patient, for example, who had leukemia and very few blood platelets, one of the blood components needed for blood clotting. Although the pregnancy did not, strictly speaking, threaten her life, she needed to terminate the pregnancy to preserve her health. If she had chosen to continue the pregnancy, she would have been at significant risk for hemorrhaging. In addition, this patient needed to undergo chemotherapy, which was inconsistent with carrying the pregnancy to term. Another patient who recently had a termination in my department at twenty-two weeks LMP had renal failure and HELLP syndrome, a very severe complication of pregnancy that puts the woman at risk of death. Women suffering from HELLP syndrome can die from renal failure, liver failure, or other potentially fatal organ effects. Other patients have had breast cancer and have chosen abortion because continued pregnancy might worsen their prognosis and delay

appropriate treatment of the cancer. (Oftentimes, therapy for breast cancer is unsafe for the developing fetus.) Some of the other women for whom I have provided abortions had severe cardiac conditions: continued pregnancy would put them at risk of further heart failure and even death. I have provided abortions for patients with many other medical conditions including chorioamnionitis (severe infection of the placenta and amniotic sac); life-threatening rejection of transplanted vital organs, such as the liver; severe complications from diabetes; severe neurological disease including brain tumors; and other cerebrovascular diseases.

7. My abortion patients also include women experiencing pregnancy loss or, in lay terms, "miscarriage." These conditions include spontaneous abortion, pre-term premature rupture of membranes, and other pregnancy failures. I treat approximately one such patient each week, most of them in the second trimester of pregnancy. I see a disproportionate number of such patients in the second trimester of pregnancy because while most obstetricians have the knowledge and surgical skill to treat these patients in the first trimester, they tend to refer to a physician with specialized surgical skills when pregnancy loss occurs after the first trimester. In many of these cases, fetal demise has already occurred when I perform or complete the abortion, but in other cases – as when the woman has suffered premature rupture of membranes – the fetus is still living. These women seek my care to preserve their health.

8. Legal, induced abortion is extremely safe and is many times safer for a woman than continuing pregnancy through term and giving birth. Still, generally speaking, the earlier in pregnancy an abortion takes place, the safer it is. The vast majority of induced abortions in this country occur in the first trimester of pregnancy.

9. Because of the nature of my practice, however, most of the abortions I perform,

teach, and supervise occur after the first trimester: often, it is not possible to diagnose fetal anomalies before the second trimester, and the maternal health conditions that necessitate abortion often worsen in the second trimester. In addition, because few physicians have the expertise to perform second-trimester procedures, my colleagues and I see a concentration of patients in need of these procedures as a result of referrals. Within my second-trimester practice, approximately two-thirds of my procedures occur before approximately twenty weeks LMP, and approximately one-third occur at or after that point in pregnancy. Again, this is highly unusual: nationally, abortions past twenty weeks LMP are rare.

10. During the first trimester, I, like most physicians, generally use the suction curettage method (also called vacuum aspiration). I dilate the cervix (the lower, narrow end of the uterus that opens into the vagina), and then insert a suction tube through the cervix and into the uterus. Using the suction, I then empty the uterus. Another method I use for early first-trimester abortion involves the use of medicines such as mifepristone (RU-486).

11. In the second trimester, suction curettage no longer suffices to empty the uterus. As a result, I, like other physicians around the nation, use the dilation and evacuation method of abortion, called D&E, for almost all second-trimester abortions. D&Es are safe, common procedures.

a. At the beginning of a D&E procedure, I dilate the cervix by inserting multiple osmotic dilators made of laminaria (seaweed). These laminaria absorb fluid from the cervix and expand gradually over several hours or overnight. The farther the pregnancy has progressed, the greater the dilation necessary to remove the fetus. Depending on the stage of pregnancy, I use one to three successive sets of laminaria. In appropriate cases, I also use

misoprostol to aid in dilation. In cases of pregnancy loss, it is common for the woman to present with the cervix already dilated, and I adapt my technique accordingly: in some of these cases I do not need to dilate the cervix at all.

b. After the cervix is adequately dilated, I remove the laminaria and then begin to evacuate the uterus. To make it easier (and thus safer) to work in the uterus, I generally grasp the cervical opening with an instrument and pull it down as close as possible to the vaginal opening, sometimes bringing the cervix right to the level of the vaginal opening. After rupturing the amniotic sac, I deliver the fetus, the placenta, and the other products of conception using a combination of manual extraction, suction curettage, and forceps.

12. Each D&E progresses differently, as it should: like all physicians, I have my own techniques that maximize safety for my patients in general; like all physicians, I adapt my techniques as each procedure progresses to provide the safest possible care for each individual patient. In every D&E, I try to minimize the number of times I must insert instruments into the woman's body, because the fewer insertions of instruments, the safer the procedure. That means that every time I insert an instrument, I try to remove as much of the fetus as possible. Thus, I always try to deliver the fetus as intact as possible. That is always my goal in a D&E, because it is always my goal to remove the fetus as safely as possible for the woman.

13. In my experience and in my hands, D&Es before approximately twenty weeks LMP are unlikely to result in an intact or relatively intact delivery because the fetal tissue is relatively fragile. At the beginning of a D&E before twenty weeks LMP, I generally reach into the uterus with a suction tube; rupture the amniotic sac; and evacuate the amniotic fluid. I generally then insert forceps through the cervix and into the uterus; grasp a fetal part in the

forceps; pull on the forceps; and bring as much of the fetus as possible through the cervix. I usually have to deliver the fetus in parts: as I withdraw the forceps from the uterus, still grasping a fetal part, I eventually meet resistance when a larger part of the fetus inside the uterus will not pass through the cervical opening. When that happens, I typically have to disarticulate part(s) of the fetus; use forceps or suction to collapse or compress part(s) of the fetus; or sever the part of the fetus that is outside the cervix, clearing the cervix to allow me to reinsert the forceps. I keep inserting the forceps, removing as much of the fetus as possible each time, until I have emptied the uterus completely. In almost all D&Es, regardless of how intact I am able to remove the fetus, the calvarium (the skull) is too large to pass through the cervix, and I must collapse it.

14. Occasionally in D&Es before twenty weeks LMP, I am able to remove the fetus largely intact. For example, it is common for the fetus to be in a breech presentation, meaning that the lower extremities are nearest to the cervix. When this is the case, I am sometimes able to remove the fetus feet first and intact, or mostly intact, until the skull lodges in the cervix. At that point, I typically compress the skull with forceps to allow it to pass through the cervix. Such a D&E may progress in a variety of ways. For example, with the first insertion of instruments into the uterus, I might withdraw a fetal leg, find that no more of the fetus will fit through the cervix at that point, and then disjoin the leg from the rest of the fetus; with the next insertion of instruments, I might be able to deliver the rest of the fetus intact until the skull lodges in the cervix. Alternatively, the fetus might be entirely intact at the point when the skull lodges in the cervix. As I noted above, intact procedures are not common in my experience before twenty weeks LMP. Nonetheless, because it is safest for my patient, when I begin to evacuate the uterus before twenty weeks LMP, if possible, I try to use the intact D&E variation of D&E, described

below.

15. Starting at approximately twenty weeks LMP, fetal tissue is less likely to fragment, and I am therefore more likely to succeed in an intact procedure. This is sometimes called an intact D&E or a dilation and extraction (D&X). The intact D&E method is really an evolution of D&E practice: it simply increases the likelihood that I will be able to remove the fetus intact or relatively intact, with the fewest possible insertions of instruments into the woman.

16. Hence, at and after twenty weeks LMP, trying to use the intact D&E method, I usually reach into the cervix with my fingers and feel for a foot. If I am able to grasp a foot, I attempt to remove first the lower extremities. I proceed this way when, as is common, the fetus is already in a breech presentation, meaning that the lower extremities are nearest to the cervix, or when I happen to grasp the feet; I do not make a particular effort to turn or convert the fetus to a breech presentation. After removing the lower extremities, I try to maneuver the rest of the fetus out through the cervix without instrumentation, until the skull lodges in the cervix. At that point, to allow the skull to pass through the cervix, I reduce the size of the skull, typically by breeching it with a finger or scissors and then compressing it with forceps. Even when I try to use the intact D&E method, I often have to use instrumentation to disjoin, sever, or collapse fetal parts other than the head. For example, just as in some procedures before twenty weeks LMP, I might first disjoin a leg, and then be able to remove the rest of the fetus intact until the skull lodges. In roughly half of the cases at and after approximately twenty weeks LMP in which I am able to grasp the feet first, I am then able to bring the fetus out intact up to approximately the point of the umbilicus (navel). Then I often meet resistance because the rest of the abdomen will not fit through the cervix. At this point, I typically make an incision in the fetal abdomen, which

allows its contents to drain out through the woman's vagina. This reduces the size of the abdomen and allows me to remove it through the cervix more safely. It also increases the chances for relatively intact removal of the fetus and thus a safer procedure. In other cases, however, I simply have to remove the fetus in parts, which involves more instrumentation.

17. Based on my experience, the safest way to perform a D&E is to deliver the fetus intact or largely intact whenever possible. Several examples illustrate why this is so. Performing a D&E in an intact manner minimizes the risk of uterine perforation or cervical laceration for two reasons: it decreases and in some cases completely eliminates the passage of sharp instruments through the cervix and into the uterus, and it decreases or eliminates the passage of sharp, bony pieces through the cervix. Delivering the fetus intact may also involve a shorter time in surgery, and thus less blood loss and less trauma for the patient. Performing a D&E intact may reduce the risk of retained fetal tissue. Additionally, delivering a fetus intact may be the most medically appropriate and safest procedure in cases of fetal anomalies: in these cases, pathologists often request an intact delivery to facilitate diagnosis of gross anomalies, which helps the patient, her family, and her physician understand what happened in the pregnancy and what the risks of recurrence might be. This is particularly important where a patient ends a wanted pregnancy because of single or multiple fetal anomalies, and she hopes to become pregnant and carry to term in the future. Even where such testing is not called for, an intact D&E has particular advantages in the presence of certain fetal anomalies. For example, it can be a real challenge to remove the fetal head when it is greatly enlarged by an anomaly such as severe hydrocephalus (enlargement of the cranium due to excessive cerebrospinal fluid). In such cases, the intact D&E method allows the physician greater surgical control while reducing the size of the head to bring

it safely through the cervix.

18. Because of these advantages, I use the intact D&E whenever possible. I have also used intact D&E to the specific benefit of patients with particular medical concerns. For example, because intact D&E minimizes the risks of perforation and laceration, it offers particular advantages for a patient at increased risk for hemorrhage, such as a leukemic patient who has poor blood clotting function. I have also used it for patients at increased risk for perforation, such as a patient with severe choriamnionitis, which renders the uterus lax and therefore at heightened risk of perforation, and a patient who had a prior uterine incision that had penetrated the endometrial cavity.

19. Hence, I disagree with the medical assertions in the Act's Findings section. The Findings section uses the non-medical term "partial-birth abortion," and it does not describe steps particular to intact D&E. It nonetheless seems to discuss the safety of intact D&E, in response to the treatment of intact D&E in the Stenberg v. Carhart Supreme Court case. Act, Sec. 2(14)(a), 2(3). The Findings claim that intact D&E endangers women because it assertedly involves the following elements: dilating the cervix, converting (or turning) the fetus to a breech presentation, and "blind" instrumentation when the physician makes an incision in the skull in order to collapse it with suction.

a. First, each of these elements is common to D&Es in general: any instrumentation inside the uterus is "blind" because the physician cannot see the interior of the uterus; all D&Es require instrumentation to collapse the skull and remove it safely; all D&Es require dilation before evacuating the uterus; and conversion (turning the fetus) can occur in any D&E at any point in the second trimester. (At the outset of a D&E, it is common for the fetus to

be neither breech nor head-first, but rather sideways in the uterus. Nonetheless, the first fetal part the physician grasps is frequently a foot or the feet. This means that when the physician starts pulling the fetus out of the uterus, he or she will turn, or convert, the fetus to a breech presentation. Of course, if the fetus is already in a breech presentation, conversion will not occur, and that is true without regard to whether the physician then delivers the fetus intact or fragmented.)

b. Second, the assertions in the Act's Findings section as to safety are incorrect. I am aware of no support for the claim that dilation or conversion in D&Es generally or in intact D&Es specifically causes harm to the woman, including cervical incompetence. In addition, as previously described, I believe that intact or relatively intact procedures *decrease* risks to the woman as compared with procedures that involve more dismemberment and thus more "blind" instrumentation. In every D&E, the physician must compress the head to make it fit through the cervix, and making an incision at the base of the skull when it is immobilized at the opening of the cervix *increases* safety.

20. Other than D&E, the only routine abortion procedure used after the first trimester is induction abortion, which entails inducing labor. Induction abortions are much less common than D&Es, but they are still safe, routine procedures. While I perform induction procedures, I use the D&E method much more often because I believe it is preferable for patients. However, I have performed numerous induction abortions and, because of my expertise in D&E techniques, I am occasionally called on to intervene in, or complete, an induction abortion surgically. In inductions, the woman's contractions generally expel the fetus, but it is common for the physician to need to intervene surgically. For example, just as in some D&E procedures,

the skull may be too large to pass through the cervix whole. In that event, the physician must compress it with suction or forceps. It can also happen that an induction fails, and the physician simply has to perform a D&E. Approximately fifteen to thirty percent of induction abortions are complicated by retention of the placenta, requiring surgical intervention.

21. In extremely rare circumstances, it may also be appropriate to terminate a pregnancy using abdominal surgery: either hysterotomy, which entails removing the fetus through an incision in the abdominal and uterine walls, or hysterectomy, the removal of the uterus. These methods involve much higher risks for the woman than more common procedures; they are therefore almost never medically indicated.

The Act and Abortion Practice

22. I am deeply disturbed by the Act's disregard for women's health. Its ban is so oddly and broadly worded as to threaten physicians with criminal prosecution if we continue to use the abortion methods and techniques that in our best medical judgment are optimal for many patients after the first trimester of pregnancy. The Act threatens us when treating women with critical medical conditions because it contains absolutely no health exception and because its life exception is ineffective even for women whose lives are at stake.

23. The Act bans "deliberately and intentionally vaginally deliver[ing] a living fetus until, in the case of a head-first presentation, the entire fetal head is outside the body of the mother, or, in the case of breech presentation, any part of the fetal trunk past the navel is outside the body of the mother for the purpose of performing an overt act that the person knows will kill the partially delivered living fetus," and then "perform[ing] the overt act, other than completion

of delivery, that kills the partially delivered living fetus." This non-medical language applies regardless of whether the fetus is viable and regardless of whether the fetus is intact.

24. The language in the ban is confusing and does not specify what medical procedure or procedures expose me to prosecution. As I detail below, the ban describes steps I take every day in caring for patients in the second trimester of pregnancy who need induced abortions or who are experiencing pregnancy loss. Adding another layer of confusion, the description of "partial-birth abortion" in the Findings section differs from the definition of "partial-birth abortion" in the ban. The Findings section criticizes abortions that are performed after twenty weeks LMP and that involve dilating the cervix, converting the fetus to a breech presentation, delivering it until only the head remains in the uterus, and inserting instruments into the base of the fetal skull. Neither the twenty-week reference nor any of these steps appears in the ban.

25. Still, faced with criminal liability, I must attempt to figure out exactly what is banned by this language. Given the consistent focus on intact D&E by proponents of "partial-birth abortion" bans (and discussion of its safety in the Findings), I assume that intact D&Es are among those prohibited by the Act. As I noted above, I perform intact D&Es and relatively intact D&Es: sometimes the fetus is entirely intact when I collapse the skull; sometimes I have, for example, disjoined a leg before being able to remove the rest of the fetus until the skull lodges in the cervix. Either way, the abortion falls within the Act, which nowhere states that the fetus must be intact.

26. The ban states that the physician deliberately and intentionally delivers the fetus until, in the case of a breech presentation, part of the trunk above the navel is outside the woman. This occurs in my practice in a number of ways. For example, in procedures in which I

am able to bring the fetus out intact or largely intact until the head lodges in the cervix, it is often true that part of the fetal trunk above the navel is outside the woman, and it is always true that I bring the fetus out to this point "deliberately and intentionally" – for every step in every abortion procedure is deliberate and intentional. The ban then states that the physician delivers the fetus to that point "for the purpose of performing an overt act that the physician knows will kill the partially delivered fetus." The Findings section suggests that collapsing the skull by removing its contents can be this "overt act." Act, Sec. 2(1). However, I, like other physicians, deliver the fetus until the skull lodges not "for the purpose of" collapsing the skull, but for the purpose of performing whatever steps will most safely complete the procedure, and I know that the safest steps often include collapsing the skull in this way. Finally, the ban states that the physician knows the overt act will kill the fetus, and that the overt act (other than completion of delivery) does kill the fetus. By the time I collapse the skull in such a procedure, I have generally taken several other steps that can cause fetal demise, such as removing much of the fetus from the uterus, possibly dismembering or collapsing a fetal part, and severing the umbilical cord. However, because none of these events stops the heartbeat instantly, in some cases, at the time I collapse the skull the fetus may still have a heartbeat. Although I have no way of knowing which precise act during the abortion actually kills the fetus, I know that collapsing the skull is an act the fetus cannot survive. Thus, when I perform such abortions, I fear I am at risk of criminal prosecution under the Act, even though I do not perform the conversion step referred to in the Findings: for the ban itself does not mention conversion at all. Similarly, unlike the Findings, the ban itself does not refer to collapsing the skull by removing its contents. I therefore believe I violate the ban when I collapse the skull with forceps. Any and every D&E has the potential to

proceed this way.

27. But in the course of second-trimester abortions I take many steps other than collapsing the skull that are also lethal, "overt acts," apparently covered by the ban. In some abortions, I take these steps after delivering the relevant part of the fetus (the head or part of the trunk above the navel); and I take these steps knowing that they will kill the fetus in the sense that the fetus is still living but cannot survive them. For example, as noted above, I am often able to deliver the fetus intact or relatively intact in a breech presentation up to approximately the navel, and then I meet resistance because the rest of the abdomen will not fit through the cervix. At this point, I typically make an incision in the fetal abdomen to collapse it. Just as when I collapse the skull, I have deliberately and intentionally delivered as much of the fetus as possible, in some cases bringing part of the trunk past the navel outside the woman; I have done so for the purpose of performing whatever steps or acts will most safely evacuate the uterus, knowing that those steps may include making an incision in the abdomen; and I know that making this incision is lethal to the fetus. I will thus commit the "overt act" referred to in the Act's ban by making this incision and collapsing the abdomen.

28. Any and every D&E abortion can unfold in myriad other ways that will also violate the ban. As described above, when *any* fetal part causes resistence at the cervix, I do whatever is safest for the particular patient: using suction or forceps, I collapse the fetal part that is too large to pass through the cervix; I sever the part of the fetus that is already outside the cervix, which allows me to reinsert my forceps; or I disjoin the part of the fetus that is in my forceps. For example, in the abortions I describe in the previous paragraph, rather than collapse the abdomen, it might be safest to sever the part of the fetus that is outside the cervix. Clearly,

evering the fetus is every bit as much a lethal "overt act" as collapsing a fetal part, and I believe such an abortion will violate the ban for precisely the same reasons. It inevitably occurs in some D&Es that I deliver part of the trunk past the navel outside the woman while the fetus still has a heartbeat; that I do so for the purpose of performing whatever steps are safest, knowing that the safest steps may be to sever, collapse, or disjoin a fetal part at that point; and that I know that severing, collapsing, or disjoining a fetal part is lethal to the fetus.

29. The Act will also expose me to criminal prosecution when performing D&Es where the fetus is in a vertex (head-first) presentation. For example, after I deliver the head outside the woman, I may find the umbilical cord tangled around the fetal neck. In such cases, where it is safe to do so, I will cut the cord. At the point at which I cut the cord, I have deliberately delivered the fetus until the head is outside the woman; I have done so for the purpose, as always, of maximizing patient safety, including cutting the cord when that is the safest course; and, in those cases in which the fetus is still living, I know that cutting the cord will be lethal to it. The Act will ban this too.

30. For the same reasons, the Act threatens induction abortions as well. For example, any induction abortion can simply fail, requiring a physician to perform a D&E, which would risk violating the Act for the reasons described above. In other induction abortions, the fetus could potentially emerge feet first up to the head, but then the head might be too large to pass through the cervix. In that event, just as in a D&E, it is often safest to compress the head with suction or forceps to allow it to fit through the cervix. In still other induction abortions, complications such as infection or hemorrhage necessitate evacuating the uterus as quickly as possible. This is typically accomplished by using the surgical techniques of D&E. In each of these cases,

depending on how the procedure has progressed, the physician has deliberately and intentionally delivered outside the woman's body either the fetal head or part of the trunk above the navel, and has done so for the purpose of performing the step or steps that will most safely empty the uterus, including collapsing the head or completing the abortion with a D&E when indicated. In most instances, the fetus would no longer exhibit signs of life when the physician commits those "overt acts"; but in those cases in which there is still a fetal heartbeat, the physician knows that those acts are lethal. Just as with D&Es that unfold in similar ways, these inductions would violate the ban. Each time a physician begins an induction abortion, he or she knows that it may progress in one of these ways that violate the ban.

31. Finally, the Act threatens me with criminal prosecution for treating women experiencing potential pregnancy loss (miscarriage) after the first trimester of pregnancy. When, for example, a woman in the second trimester arrives at the hospital suffering pre-term premature rupture of membranes or other pregnancy failures, a D&E is often indicated, except that I do not need to dilate the cervix if it is already dilated. As the ban makes no mention of dilating the cervix, it will prohibit my actions in treating all those women who present with the fetus still living, just as the ban prohibits my actions when I perform a D&E for women who are not miscarrying. All of the induced abortion D&E scenarios described above also occur when I perform a D&E for women suffering pre-term premature rupture of membranes or other pregnancy failures necessitating such a procedure, and the Act will prohibit such procedures in this context as well.

32. As the preceding paragraphs illustrate, D&Es, inductions, and the treatment of pregnancy loss can proceed in numerous ways. Not every procedure will violate the Act.

However, at the beginning of each procedure, the physician knows that proceeding in the safest manner for the patient may require taking steps that violate the Act, and the physician cannot predict when this will occur. For that reason, the Act threatens physicians with criminal prosecution every time they begin one of these procedures.

The Act's Harmful Impact

33. The procedures the Act bans are critical to women's health. As my descriptions of my practice make clear, I cannot predict how a given procedure will progress: during each procedure, I continuously assess how to provide the safest care for the particular patient. That is how I decide what my next step will be, and that is my duty. The Act necessarily seeks to divert me from that course. It is outrageous for the government to threaten me with prosecution for fulfilling my professional obligation to put my patients' medical well-being first. However physicians respond – if they stop providing banned procedures, if they risk prosecution by continuing to provide the safest care possible, or if they somehow try to provide care but avoid prosecution – the result will be harm to them and their patients.

34. In total disregard for women's medical welfare, the Act lacks any exception to preserve women's health. As I described earlier, my patients terminating their pregnancies or experiencing pregnancy loss include many women whose health is at grave risk. Women with these kinds of medical complications will suffer particular harm if the Act deters their physicians from proceeding according to their best medical judgment in providing abortion care.

35. The Act's life exception does not protect women even when they are at risk of death. It applies only when techniques that violate the Act are "necessary to save the life of the

mother whose life is endangered by a physical disorder, a physical illness, or physical injury, including a life-endangering physical condition caused by or arising from the pregnancy itself." First, rather than provide an exception whenever a woman's life is at stake, this exception applies only when a banned procedure is "necessary" to save a woman's life. But in almost every case, other procedures that are not banned, such as hysterotomy or hysterectomy, would likely save the woman's life, even though they pose far greater risks and can have irreversible medical consequences for the woman. A banned procedure will thus almost never be "necessary," and the Act will simply force even dying women to undergo more dangerous procedures. Second, the exception does not entrust to the physician's best medical judgment the decision as to when a banned procedure is "necessary," meaning that the physician is vulnerable to prosecution if others disagree with his or her judgment regarding necessity. Again, the Act imperils women without regard to whether they are seriously ill, or even at risk of death.

36. In addition, it makes no sense for the Act to include a life exception, but to state in the Findings section that a health exception is never necessary. The Act's life exception refers to those circumstances in which techniques that violate the Act will save a woman once she is dying; that, however, sometimes means that those same techniques would have preserved her health if her physician had been allowed to use them before she declined to the point at which she was dying. Whatever a patient's particular set of medical complications, my duty is to try to provide the best possible treatment before that point.

Conclusion

37. The Act threatens physicians and endangers women. If it is not enjoined, it will

irreparably harm me and my patients. To protect patients from these harms, enforcement of the Act must be blocked before it takes effect. First, many patients require induced abortions banned by the Act, and some of these women need this care urgently to preserve their health. Second, physicians must have immediate access to procedures banned by the Act to treat pregnancy loss or other emergencies; delay in such cases would put patients at significant risk. My service typically receives calls every day or every other day about women who need to undergo a banned procedure in order to prevent grave health consequences. Third, enforcement of the Act on any day would jeopardize the health of those patients who are essentially mid-procedure on the Act's effective date. For example, in D&Es, physicians generally initiate cervical dilation anywhere from several hours to two days prior to performing the evacuation phase of the procedure. Such an interval is generally necessary for the cervix to dilate sufficiently. Hence, some women whose physicians initiate dilation before the Act takes effect will be sufficiently dilated only after the Act's scheduled effective date. At that point, once the patient's cervix is sufficiently dilated, the physician must not delay evacuating the uterus, as doing so puts the patient at increased risk. For all these reasons, the Act will cause irreparable harm if it is permitted to take effect for even a short period.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on , 2003

______________________

Cassing Hammond, M.D.

JAMES B. COMEY
United States Attorney for the
Southern District of New York
By: SHEILA M. GOWAN (SG: 8201)
SEAN H. LANE (SL: 4898)
JOSEPH A. PANTOJA (JP: 1845)
Assistant United States Attorneys
33 Whitehall Street -- 8th floor
New York, New York 10004

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

NATIONAL ABORTION FEDERATION; MARK I. EVANS, M.D.; CAROLYN WESTHOFF, M.D., M.Sc; CASSING HAMMOND, M.D.; MARC HELLER, M.D.; TIMOTHY R.B. JOHNSON, M.D.; STEPHEN CHASEN, M.D.; GERSON WEISS, M.D., on behalf of themselves and their patients,

Plaintiffs,

- against -

JOHN ASHCROFT, in his capacity as Attorney General of the United States, along with his officers, agents, servants, employees, and successors in office,

Defendant.

Government's First Set of Interrogatories and Requests for Documents Directed to <u>Plaintiff Cassing Hammond, MD</u>

03 Civ. 8695 (RCC)

PLEASE TAKE NOTICE THAT, pursuant to Rules 33 and 34 of the Federal Rules of Civil Procedure, and Rules 33.3 and 26.3 of this Court, defendant Attorney General John Ashcroft (the "government"), by his attorney, James B. Comey, United States Attorney for the Southern District of New York, hereby requests plaintiff Cassing Hammond, MD., to answer under oath the following written interrogatories and requests for documents, separately and fully in writing, within thirty days after the date of service of this Notice. The answers hereto should include all information known up to the date of the verification thereof.

PLEASE TAKE FURTHER NOTICE THAT each interrogatory and each subpart of each interrogatory should be accorded a separate answer. <u>Each answer should first set forth verbatim the interrogatory to which it is responsive.</u> Interrogatories or subparts thereof should not be combined for the purpose of supplying a common answer. The answer to an interrogatory or a subpart should not be supplied by referring to the answer to another interrogatory or subpart

EXHIBIT D

thereof unless the interrogatory or subpart referred to supplies a complete and accurate answer to the interrogatory or subpart being answered.

PLEASE TAKE FURTHER NOTICE THAT these interrogatories and this request for documents are continuing and you should promptly supply by way of supplemental answers any and all additional responsive information or documents that may become known prior to the trial of this action.

## DEFINITIONS

A. DOCUMENT: The word "document" has the meaning of "documents" set forth in Rule 34(a) of the Federal Rules of Civil Procedure, and includes writings, drawings, graphs, charts, photographs, computer disks, and any other data compilations from which information can be obtained and/or translated, if necessary, by the respondent through detection devices into reasonably usable form.

B. IDENTIFY: To "identify" a person means to give, to the extent known, the person's full name, present or last known home address and telephone number, and the present or last known address and telephone number of place of employment. To "identify" a document means to give, to the extent known, (a) the type of document; (b) the general subject matter; (c) the date of the document; (d) the author(s), addressee(s) and recipient(s); and (e) if the document is a medical record, the location where the medical record is kept. To identify a firm, partnership, corporation, business trust or other association or a division, department or unit means to give, to the extent known, its full name and principal office address and telephone.

C. ADDITIONAL TERMS: The definitions of "communication," terms referring to parties, "person," "concerning," "all," "each," "and," "or," and other terms contained in Rule 26.3 of the Civil Rules of the United States District Court for the Southern District of New York apply herein.

D. MEDICAL RECORD NUMBER: "Medical record number" means the number assigned to the medical records relating to a particular patient or other identifier

sufficient to enable retrieval of the patient's medical records.

**INSTRUCTIONS**

E. Responses to requests to identify documents and persons shall be in accordance with Rules 26.3(c)(3) and (4) of the Civil Rules of the United States District Court for the Southern District of New York.

F. Where duplicate copies of one document exist, these need not be produced unless they contain writings or notes which do not appear on all other copies of that document.

G. If you refuse to identify and/or withhold any document requested herein on the ground of privilege, you must comply with the requirements of Rule 26.2(a)(1) and (2)(A) of the Civil Rules of the United States District Court for the Southern District of New York in setting forth the information listed therein with respect to each claim of privilege.

**INTERROGATORIES**

1. Identify the patient medical record number for the abortions services that you have performed or supervised within the year 2003 for women who are nineteen (19) to twenty (20) weeks LMP and "who are ending wanted pregnancies after learning that their fetuses have anomalies that are often quite severe," as stated in paragraph 4 of your declaration in this case.

2. Identify the patient medical record number for the abortions services that you have performed or supervised within the year 2003 for women who are nineteen (19) to twenty (20) weeks LMP and "who must end pregnancies in order to preserve their health," as stated in paragraph 4 of your declaration in this case.

3. Identify the patient medical record number for the abortions services that you have performed or supervised within the year 2003 for women who are nineteen (19) to twenty (20) weeks LMP and who are "experiencing pregnancy loss, which in lay terms is sometimes called miscarrying," as stated in paragraph 4 of your declaration in this case.

4. Identify the patient medical record number for the abortions services that

you have performed or supervised within the year 2003 "where, if the pregnancy continued, the fetus would die before onset of labor or within the first year of life because of Trisomy 13 or Trisomy 18," as stated in paragraph 5 of your declaration in this case.

5. Identify the patient medical record number for those abortions that you have performed or supervised within the year 2003 because the fetus had "anencephaly and other severe neural tube defects" as stated in paragraph 5 of your declaration in this case.

6. Identify the patient medical record number for those abortions that you have performed or supervised within the year 2003 because the patient was "suffering from severe oligohydramnios" as stated in paragraph 5 of your declaration in this case.

7. Identify the patient medical record number for the abortion that you performed or supervised for the patient who had leukemia as stated in paragraph 6 of your declaration in this case.

8. Identify the patient medical record number for the abortion that you performed or supervised for the patient who had "renal failure and HELLP syndrome" as stated in paragraph 6 of your declaration in this case.

9. Identify the patient medical record numbers for the abortions that you performed or supervised within the year 2003 for patients who are sixteen (16) or more weeks LMP who had "breast cancer and have chosen abortion because continued pregnancy might worsen their prognosis and delay appropriate treatment of cancer" as stated in paragraph 6 of your declaration in this case.

10. Identify the patient medical record numbers for the abortions that you performed or supervised within the year 2003 for patients who are sixteen (16) or more weeks LMP who had "severe cardiac conditions; continued pregnancy would put them at risk of further heart failure and even death" as stated in paragraph 6 of your declaration in this case.

11. Identify the patient medical record numbers for the abortions that you performed or supervised within the year 2003 for patients who are sixteen (16) or more weeks

LMP who had "chorioamnionitis" as stated in paragraph 6 of your declaration in this case.

12. Identify the patient medical record numbers for the abortions that you performed or supervised within the past two (2) years for patients who are sixteen (16) or more weeks LMP who had "life-threatening rejection of transplanted vital organs, such as the liver" as stated in paragraph 6 of your declaration in this case.

13. Identify the patient medical record numbers for the abortions that you performed or supervised within the past two (2) years for patients who are sixteen (16) or more weeks LMP who had "severe neurological disease including brain tumors" as stated in paragraph 6 of your declaration in this case.

14. Identify the patient medical record numbers for the abortions that you performed or supervised within the past two (2) years for patients who are sixteen (16) or more weeks LMP who had "severe complications from diabetes" as stated in paragraph 6 of your declaration in this case.

15. Identify the patient medical record numbers for the abortions that you performed or supervised within the past two (2) years for patients who are sixteen (16) or more weeks LMP who had "cerebrovascular disease" as stated in paragraph 6 of your declaration in this case.

16. Identify the patient medical record numbers for the abortions that you performed or supervised within the past two (2) months for patients who are sixteen (16) or more weeks LMP and who experience "pregnancy loss or, in lay terms, 'miscarriage,'" and where fetal demise has already occurred as stated in paragraph 7 of your declaration in this case.

17. Identify all persons to whom you have taught the "intact D&E method" as referred to in paragraph 16 of your declaration in this case.

18. Identify any document and/or data that supports your belief (as stated in paragraph 19(b) of your declaration in this case) that intact D&E "*decrease[s]* risks to the woman as compared with procedures that involve more dismemberment and thus more 'blind'

instrumentation.'" Id. (emphasis in the original).

19. Identify which, if any, of the "Scholarly Productivity" listed in the curriculum vitae submitted with your declaration in this case concern the abortion method intact D&E, also known as intact dilation and extraction or D&X as stated in paragraph 39 of the complaint.

20. Identify which, if any, of the "Publications" and/or "Publications in Press" listed in the curriculum vitae submitted with your declaration in this case concern the abortion method intact D&E, also known as intact dilation and extraction or D&X as stated in paragraph 39 of the complaint.

21. Identify which, if any, of the "Ongoing Studies" listed in the curriculum vitae submitted with your declaration in this case concern the abortion method intact D&E, also known as intact dilation and extraction or D&X as stated in paragraph 39 of the complaint.

22. Identify the case caption and case number for all legal proceedings in which you have testified concerning the abortion method intact D&E, also known as intact dilation and extraction or D&X as stated in paragraph 39 of the complaint.

23. Identify the case caption and case number for all legal proceedings in which you have submitted declarations and/or affidavits concerning the abortion method intact D&E, also known as intact dilation and extraction or D&X as stated in paragraph 39 of the complaint.

24. Identify the patient medical record numbers for the abortions performed or supervised by you, during or after the second trimester of a patient's pregnancy, within the year 2003, where a procedure utilizing injection(s) of chemical of agent(s) in order to effect intrauterine fetal demise was considered but its use was rejected either by you or by the patient.

25. Identify the state(s) of residence of all patients for whom you have performed or supervised an abortion within the past three years by the abortion method intact D&E, also known as intact dilation and extraction or D&X as stated in paragraph 39 of the

complaint.

DOCUMENT REQUESTS

1. All documents identified in response to any interrogatory set forth herein.

2. The medical records associated with the patient medical record numbers identified in response to interrogatory numbers 1 through 16, and 24.

3. All transcripts of your testimony identified in response to interrogatory number 22.

4. All declarations and/or affidavits identified in response to interrogatory number 23.

5. All teaching material that you have prepared concerning the abortion method intact D&E, also known as intact dilation and extraction or D&X as stated in paragraph 39 of the complaint.

6.. All teaching material that you have used concerning the abortion method intact D&E, also known as intact dilation and extraction or D&X as stated in paragraph 39 of the complaint.

7. All written materials that relate to your response to interrogatories 19 through 21.

8. All documents and/or visual depictions used by you to inform or educate your patients (or prospective patients) about the abortion method intact D&E, also known as intact dilation and extraction or D&X as stated in paragraph 39 of the complaint.

9. Examples of all consent forms (blank) used by you for abortions performed by the method intact D&E, also known as intact dilation and extraction or D&X as stated in paragraph 39 of the complaint.

10. All statistics kept by you concerning the type of abortion procedure performed on patients within the past two (2) years.

11. All written material prepared by you concerning the abortion method

intact D&E, also known as intact dilation and extraction or D&X as stated in paragraph 39 of the complaint.

Dated: New York, New York
November 21, 2003

Respectfully submitted,

JAMES B. COMEY
United States Attorney for the
Southern District of New York,
Attorney for Defendant

By: /s/
SHEILA M. GOWAN (SG: 8201)
SEAN H. LANE (SL: 4898)
JOSEPH A. PANTOJA (JP: 1845)
Assistant United States Attorneys
33 Whitehall Street – 8th Floor
New York, New York 10004
Tel. No.: (212) 637-2697

**Certificate of Service**

I, SHEILA M. GOWAN, Assistant United States Attorney for the Southern District of New York, hereby certify that on the 21st of November, 2003, I caused the service of a true copy of the foregoing First Set of Interrogatories and Requests for Documents Directed to Plaintiff Cassing Hammond, M.D., by overnight mail, next business day delivery, upon counsel for plaintiffs addressed as follows:

Susan Talcott Camp, Esq.
Reproductive Freedom Project
American Civil Liberties Union Foundation
125 Broad Street
New York, New York 10004

Dated: New York, New York
November 21, 2003

/s/
SHEILA M. GOWAN

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

NATIONAL ABORTION FEDERATION, MARK I. EVANS, M.D., CAROLYN WESTHOFF, M.D., M.Sc., CASSING HAMMOND, M.D., MARC HELLER, M.D., TIMOTHY R.B. JOHNSON, M.D., STEPHEN CHASEN, M.D., GERSON WEISS, M.D., on behalf of themselves and their patients,

Plaintiffs,

- against -

JOHN ASHCROFT, in his capacity as Attorney General of the United States, along with his officers, agents, servants, employees, and successors in office,

Defendant.

03 Civ. 8695 (RCC)

ORDER

RICHARD CONWAY CASEY, United States District Court Judge:

In accord with the Health Insurance Portability and Accountability Act of 1996 ("HIPPA"), 45 C.F.R. 164.512(e)(1)(i), non-party witness Northwestern Memorial Hospital (the "hospital") is authorized to disclose to the Defendant the medical records and information sought in the attached subpoena to be served on the Hospital by the Defendant pursuant to Rule 45 of the Federal Rules of Civil Procedure.

Any application regarding this subpoena must comply with Federal Rule of Civil Procedure 45(c) and (d).

So Ordered: New York, New York
December 18, 2003

Richard Conway Casey

Richard Conway Casey, U.S.D.J.

EXHIBIT
E



U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

*33 Whitehall Street*
*New York, New York 10004*

December 16, 2003

BY HAND DELIVERY

Honorable Richard Conway Casey
United States District Judge
Southern District of New York
Room 1950
500 Pearl Street
New York, New York 10007

Re: National Abortion Federation et al. v. Ashcroft, 03 Civ. 8695 (RCC)

Dear Judge Casey:

This Office represents the government in the above-referenced case. We write to respectfully request that, in accord with the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), 45 C.F.R. 164.512(e)(1)(i), Your Honor enter the enclosed orders authorizing the disclosure of patient medical records by certain non-party witnesses. Upon entry of the orders, the government anticipates the prompt service of the original Rule 45 subpoenas and the accompanying orders on the non-party witnesses, and copies thereof on plaintiffs.

Thank you for your consideration of this matter.

Respectfully,

DAVID N. KELLEY
United States Attorney

By: [signature]
SHEILA M. GOWAN
Assistant United States Attorney
Tel. No.: (212) 637-2697

EXHIBIT F

P.02

enclosures

cc: Talcott Camp, Esq. (via facsimile w/o enclosures at 212.549.2652)



U.S. Departn t of Justice

*United States Attorney*
*Southern District of New York*

33 Whitehall Street
New York, New York 10004

December 16, 2003

BY FACSIMILE

Talcott Camp, Esq.
Legal Department
Reproductive Freedom Project
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, New York 10004

Re: National Abortion Federation et al. v. Ashcroft, 03 Civ. 8695 (RCC)

Dear Ms. Camp:

As I stated in my letter to the Court, we will promptly provide you with all materials served on the non-party witnesses, as required under Rule 45 of the Federal Rules of Civil Procedure, when we serve the subpoenas. I am aware of no requirement that the government must provide you with the information in advance of that time. Indeed, to do so, may prejudice the government.

Very truly yours,

DAVID N. KELLEY
United States Attorney

By: [signature]
SHEILA M. GOWAN
Assistant United States Attorney
Tel. No.: (212) 637-2697

enclosure

EXHIBIT G

LEGAL DEPARTMENT
REPRODUCTIVE
FREEDOM PROJECT

ACLU
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION

TALCOTT CAMP
DEPUTY DIRECTOR
T/212.549.2632
tcamp@aclu.org

December 17, 2003

Via Facsimile: 212-805-7939

Honorable Richard C. Casey
United States District Judge
Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, NY 10007-1312

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
REPRODUCTIVE
FREEDOM PROJECT
NATIONAL OFFICE
125 BROAD STREET, 18TH FL.
NEW YORK, NY 10004-2400
T/212.549.2633
F/212.549.2652
WWW.ACLU.ORG

OFFICERS AND DIRECTORS
NADINE STROSSEN
PRESIDENT

ANTHONY D. ROMERO
EXECUTIVE DIRECTOR

KENNETH B. CLARK
CHAIR, NATIONAL
ADVISORY COUNCIL

RICHARD ZACKS
TREASURER

Re: National Abortion Federation v. Ashcroft, 03 Civ. 8695 (RCC)

Dear Judge Casey:

Yesterday defense counsel, Sheila Gowan, had hand delivered to chambers a letter requesting that the Court "enter the enclosed orders authorizing the disclosure of patient medical records by certain non-party witnesses." As that letter reflects, Ms. Gowan faxed me a copy of the letter, but excluded the enclosures. I subsequently asked Ms. Gowan to send me copies of the enclosures.

As reflected in the attached letter from Ms. Gowan to me, dated December 16, 2003, she refused to forward copies of the enclosures that she had sent the Court. Plaintiffs respectfully request that the Court direct Ms. Gowan to provide Plaintiffs with copies of any material that she sends the Court, including the enclosures she sent the Court yesterday.

Plaintiffs further respectfully request that the Court not enter those proposed orders until Plaintiffs have had the opportunity to review them and to make their position known to the Court. First, although Ms. Gowan is under no obligation to send me subpoenas before she serves them on third parties, Plaintiffs are entitled to know of orders she asks this Court to enter in this case. Second, without having read the proposed orders, I cannot know if they would affect my clients' interests: they may very well not, as they pertain to third parties, but I cannot ascertain that without reviewing them. Third, Plaintiffs, too, may serve subpoenas on third parties or engage



in other process that would implicate a similar need to ask the Court to enter orders, and Plaintiffs may have an interest in commenting on what the nature of such orders should be, for the case as a whole. Finally – depending on the nature of the proposed orders, and I have no way of knowing – they may implicate discovery issues the resolution of which Plaintiffs may be able to help facilitate for the case as whole, rather than in piecemeal fashion.

Thank you for your consideration of this matter.

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

Sincerely yours,

Talcott Camp
*Attorney for Plaintiffs*

cc: Sheila Gowan (w/ enclosure)



U.S. Depar[tme]nt of Justice

*United States Attorney*
*Southern District of New York*

*33 Whitehall Street*
*New York, New York 10004*

December 18, 2003

Via Facsimile @ 212.805.7939

Honorable Richard Conway Casey
United States District Judge
Southern District of New York
Room 1950
500 Pearl Street
New York, New York 10007

Re: National Abortion Federation et al. v. Ashcroft, 03 Civ. 8695 (RCC)

Dear Judge Casey:

This Office represents the government in the above-referenced case. We are reluctant to respond to plaintiffs' letter to the Court dated December 17, 2003, concerning the government's prior request for entry of orders pursuant to the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), 45 C.F.R. 164.512(e)(1)(i), in order to facilitate non-party discovery. We do not wish to unnecessarily burden the Court, and indeed, will not be responding to plaintiffs' second letter of that same date. However, we feel constrained to address the issue of the proposed HIPAA orders because plaintiffs' letter suggests that the government somehow acted inappropriately in not providing plaintiffs' counsel with copies of the orders and accompanying subpoenas when we provided counsel with a copy of the letter to the Court.

As plaintiffs' submission to the Court shows, by letter dated December 16th, we advised counsel that, in the circumstances presented, we are unaware of any duty or obligation to provide plaintiffs with the yet to be served non-party discovery, nor have plaintiffs cited any. Indeed, to do so would provide plaintiffs with advance notice of the government's anticipated litigation decisions, and may interfere with the government's ability to obtain discovery from non-party witnesses.



Thank you for your consideration of this matter.

Respectfully,

DAVID N. KELLEY
United States Attorney

By: [signature]
SHEILA M. GOWAN
Assistant United States Attorney
Tel. No.: (212) 637-2697

cc: Talcott Camp, Esq. (via facsimile at 212.549.2652)

Issued by the
**UNITED STATES DISTRICT COURT**
for the Northern District of Illinois




NATIONAL ABORTION FEDERATION, et al.,

Plaintiffs,

V.

JOHN ASHCROFT,

Defendant.

**SUBPOENA IN A CIVIL CASE**

CASE NUMBER:[1] 03 Civ. 8695 (RCC) (S.D.N.Y.)

TO: Dean M. Harrison – President and CEO
Northwestern Memorial Hospital
251 East Huron Street
Chicago, IL 60611

☐ YOU ARE COMMANDED to appear in the United States District Court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
| | DATE AND TIME |

☐ YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|
| | |

☒ YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):

All medical records associated with those medical record numbers to be identified by plaintiff Hammon Cassing in response to the discovery demand served upon him the above-captioned case. See attachment A.

| PLACE | DATE AND TIME |
|---|---|
| U.S. Attorney's Office for the Northern District of Illinois, 219 S. Dearborn St., 5th fl. Chicago, Il., 60604 | 1/7/04 10:00 a.m. |

☐ YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|
| | |

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE |
|---|---|
| Sheila M. Gowan<br>Assistant United States Attorney, Attorney for Defendant | December 18, 2003 |

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER

AUSA Sheila M. Gowan, 33 Whitehall Street, 8th Floor, New York, NY 10004 212/637-2697

EXHIBIT J

JAMES B. COMEY
United States Attorney for the
Southern District of New York
By: SHEILA M. GOWAN (SG: 8201)
SEAN H. LANE (SL: 4898)
JOSEPH A. PANTOJA (JP: 1845)
Assistant United States Attorneys
33 Whitehall Street -- 8th floor
New York, New York 10004

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

NATIONAL ABORTION FEDERATION; MARK I. EVANS, M.D.; CAROLYN WESTHOFF, M.D., M.Sc; CASSING HAMMOND, M.D.; MARC HELLER, M.D.; TIMOTHY R.B. JOHNSON, M.D.; STEPHEN CHASEN, M.D.; GERSON WEISS, M.D., on behalf of themselves and their patients,

Plaintiffs,

- against -

JOHN ASHCROFT, in his capacity as Attorney General of the United States, along with his officers, agents, servants, employees, and successors in office,

Defendant.

Government's First Set of Interrogatories and Requests for Documents Directed to Plaintiff Cassing Hammond, MD

03 Civ. 8695 (RCC)

PLEASE TAKE NOTICE THAT, pursuant to Rules 33 and 34 of the Federal Rules of Civil Procedure, and Rules 33.3 and 26.3 of this Court, defendant Attorney General John Ashcroft (the "government"), by his attorney, James B. Comey, United States Attorney for the Southern District of New York, hereby requests plaintiff Cassing Hammond, MD., to answer under oath the following written interrogatories and requests for documents, separately and fully in writing, within thirty days after the date of service of this Notice. The answers hereto should include all information known up to the date of the verification thereof.

PLEASE TAKE FURTHER NOTICE THAT each interrogatory and each subpart of each interrogatory should be accorded a separate answer. Each answer should first set forth verbatim the interrogatory to which it is responsive. Interrogatories or subparts thereof should not be combined for the purpose of supplying a common answer. The answer to an interrogatory or a subpart should not be supplied by referring to the answer to another interrogatory or subpart

thereof unless the interrogatory or subpart referred to supplies a complete and accurate answer to the interrogatory or subpart being answered.

PLEASE TAKE FURTHER NOTICE THAT these interrogatories and this request for documents are continuing and you should promptly supply by way of supplemental answers any and all additional responsive information or documents that may become known prior to the trial of this action.

## DEFINITIONS

A. DOCUMENT: The word "document" has the meaning of "documents" set forth in Rule 34(a) of the Federal Rules of Civil Procedure, and includes writings, drawings, graphs, charts, photographs, computer disks, and any other data compilations from which information can be obtained and/or translated, if necessary, by the respondent through detection devices into reasonably usable form.

B. IDENTIFY: To "identify" a person means to give, to the extent known, the person's full name, present or last known home address and telephone number, and the present or last known address and telephone number of place of employment. To "identify" a document means to give, to the extent known, (a) the type of document; (b) the general subject matter; (c) the date of the document; (d) the author(s), addressee(s) and recipient(s); and (e) if the document is a medical record, the location where the medical record is kept. To identify a firm, partnership, corporation, business trust or other association or a division, department or unit means to give, to the extent known, its full name and principal office address and telephone.

C. ADDITIONAL TERMS: The definitions of "communication," terms referring to parties, "person," "concerning," "all," "each," "and," "or," and other terms contained in Rule 26.3 of the Civil Rules of the United States District Court for the Southern District of New York apply herein.

D. MEDICAL RECORD NUMBER: "Medical record number" means the number assigned to the medical records relating to a particular patient or other identifier

sufficient to enable retrieval of the patient's medical records.

INSTRUCTIONS

E. Responses to requests to identify documents and persons shall be in accordance with Rules 26.3(c)(3) and (4) of the Civil Rules of the United States District Court for the Southern District of New York.

F. Where duplicate copies of one document exist, these need not be produced unless they contain writings or notes which do not appear on all other copies of that document.

G. If you refuse to identify and/or withhold any document requested herein on the ground of privilege, you must comply with the requirements of Rule 26.2(a)(1) and (2)(A) of the Civil Rules of the United States District Court for the Southern District of New York in setting forth the information listed therein with respect to each claim of privilege.

INTERROGATORIES

1. Identify the patient medical record number for the abortions services that you have performed or supervised within the year 2003 for women who are nineteen (19) to twenty (20) weeks LMP and "who are ending wanted pregnancies after learning that their fetuses have anomalies that are often quite severe," as stated in paragraph 4 of your declaration in this case.

2. Identify the patient medical record number for the abortions services that you have performed or supervised within the year 2003 for women who are nineteen (19) to twenty (20) weeks LMP and "who must end pregnancies in order to preserve their health," as stated in paragraph 4 of your declaration in this case.

3. Identify the patient medical record number for the abortions services that you have performed or supervised within the year 2003 for women who are nineteen (19) to twenty (20) weeks LMP and who are "experiencing pregnancy loss, which in lay terms is sometimes called miscarrying," as stated in paragraph 4 of your declaration in this case.

4. Identify the patient medical record number for the abortions services that

you have performed or supervised within the year 2003 "where, if the pregnancy continued, the fetus would die before onset of labor or within the first year of life because of Trisomy 13 or Trisomy 18," as stated in paragraph 5 of your declaration in this case.

5. Identify the patient medical record number for those abortions that you have performed or supervised within the year 2003 because the fetus had "anencephaly and other severe neural tube defects" as stated in paragraph 5 of your declaration in this case.

6. Identify the patient medical record number for those abortions that you have performed or supervised within the year 2003 because the patient was "suffering from severe oligohydramnios" as stated in paragraph 5 of your declaration in this case.

7. Identify the patient medical record number for the abortion that you performed or supervised for the patient who had leukemia as stated in paragraph 6 of your declaration in this case.

8. Identify the patient medical record number for the abortion that you performed or supervised for the patient who had "renal failure and HELLP syndrome" as stated in paragraph 6 of your declaration in this case.

9. Identify the patient medical record numbers for the abortions that you performed or supervised within the year 2003 for patients who are sixteen (16) or more weeks LMP who had "breast cancer and have chosen abortion because continued pregnancy might worsen their prognosis and delay appropriate treatment of cancer" as stated in paragraph 6 of your declaration in this case.

10. Identify the patient medical record numbers for the abortions that you performed or supervised within the year 2003 for patients who are sixteen (16) or more weeks LMP who had "severe cardiac conditions; continued pregnancy would put them at risk of further heart failure and even death" as stated in paragraph 6 of your declaration in this case.

11. Identify the patient medical record numbers for the abortions that you performed or supervised within the year 2003 for patients who are sixteen (16) or more weeks

LMP who had "chorioamnionitis" as stated in paragraph 6 of your declaration in this case.

12. Identify the patient medical record numbers for the abortions that you performed or supervised within the past two (2) years for patients who are sixteen (16) or more weeks LMP who had "life-threatening rejection of transplanted vital organs, such as the liver" as stated in paragraph 6 of your declaration in this case.

13. Identify the patient medical record numbers for the abortions that you performed or supervised within the past two (2) years for patients who are sixteen (16) or more weeks LMP who had "severe neurological disease including brain tumors" as stated in paragraph 6 of your declaration in this case.

14. Identify the patient medical record numbers for the abortions that you performed or supervised within the past two (2) years for patients who are sixteen (16) or more weeks LMP who had "severe complications from diabetes" as stated in paragraph 6 of your declaration in this case.

15. Identify the patient medical record numbers for the abortions that you performed or supervised within the past two (2) years for patients who are sixteen (16) or more weeks LMP who had "cerebrovascular disease" as stated in paragraph 6 of your declaration in this case.

16. Identify the patient medical record numbers for the abortions that you performed or supervised within the past two (2) months for patients who are sixteen (16) or more weeks LMP and who experience "pregnancy loss or, in lay terms, 'miscarriage,'" and where fetal demise has already occurred as stated in paragraph 7 of your declaration in this case.

17. Identify all persons to whom you have taught the "intact D&E method" as referred to in paragraph 16 of your declaration in this case.

18. Identify any document and/or data that supports your belief (as stated in paragraph 19(b) of your declaration in this case) that intact D&E "*decrease[s]* risks to the woman as compared with procedures that involve more dismemberment and thus more 'blind'

instrumentation.'" Id. (emphasis in the original).

19. Identify which, if any, of the "Scholarly Productivity" listed in the curriculum vitae submitted with your declaration in this case concern the abortion method intact D&E, also known as intact dilation and extraction or D&X as stated in paragraph 39 of the complaint.

20. Identify which, if any, of the "Publications" and/or "Publications in Press" listed in the curriculum vitae submitted with your declaration in this case concern the abortion method intact D&E, also known as intact dilation and extraction or D&X as stated in paragraph 39 of the complaint.

21. Identify which, if any, of the "Ongoing Studies" listed in the curriculum vitae submitted with your declaration in this case concern the abortion method intact D&E, also known as intact dilation and extraction or D&X as stated in paragraph 39 of the complaint.

22. Identify the case caption and case number for all legal proceedings in which you have testified concerning the abortion method intact D&E, also known as intact dilation and extraction or D&X as stated in paragraph 39 of the complaint.

23. Identify the case caption and case number for all legal proceedings in which you have submitted declarations and/or affidavits concerning the abortion method intact D&E, also known as intact dilation and extraction or D&X as stated in paragraph 39 of the complaint.

24. Identify the patient medical record numbers for the abortions performed or supervised by you, during or after the second trimester of a patient's pregnancy, within the year 2003, where a procedure utilizing injection(s) of chemical of agent(s) in order to effect intrauterine fetal demise was considered but its use was rejected either by you or by the patient.

25. Identify the state(s) of residence of all patients for whom you have performed or supervised an abortion within the past three years by the abortion method intact D&E, also known as intact dilation and extraction or D&X as stated in paragraph 39 of the

complaint.

DOCUMENT REQUESTS

1. All documents identified in response to any interrogatory set forth herein.

2. The medical records associated with the patient medical record numbers identified in response to interrogatory numbers 1 through 16, and 24.

3. All transcripts of your testimony identified in response to interrogatory number 22.

4. All declarations and/or affidavits identified in response to interrogatory number 23.

5. All teaching material that you have prepared concerning the abortion method intact D&E, also known as intact dilation and extraction or D&X as stated in paragraph 39 of the complaint.

6.. All teaching material that you have used concerning the abortion method intact D&E, also known as intact dilation and extraction or D&X as stated in paragraph 39 of the complaint.

7. All written materials that relate to your response to interrogatories 19 through 21.

8. All documents and/or visual depictions used by you to inform or educate your patients (or prospective patients) about the abortion method intact D&E, also known as intact dilation and extraction or D&X as stated in paragraph 39 of the complaint.

9. Examples of all consent forms (blank) used by you for abortions performed by the method intact D&E, also known as intact dilation and extraction or D&X as stated in paragraph 39 of the complaint.

10. All statistics kept by you concerning the type of abortion procedure performed on patients within the past two (2) years.

11. All written material prepared by you concerning the abortion method

intact D&E, also known as intact dilation and extraction or D&X as stated in paragraph 39 of the complaint.

Dated: New York, New York
November 21, 2003

Respectfully submitted,

JAMES B. COMEY
United States Attorney for the
Southern District of New York,
Attorney for Defendant

By: /s/
SHEILA M. GOWAN (SG: 8201)
SEAN H. LANE (SL: 4898)
JOSEPH A. PANTOJA (JP: 1845)
Assistant United States Attorneys
33 Whitehall Street – 8th Floor
New York, New York 10004
Tel. No.: (212) 637-2697

**Certificate of Service**

I, SHEILA M. GOWAN, Assistant United States Attorney for the Southern District of New York, hereby certify that on the 21st of November, 2003, I caused the service of a true copy of the foregoing First Set of Interrogatories and Requests for Documents Directed to Plaintiff Cassing Hammond, M.D., by overnight mail, next business day delivery, upon counsel for plaintiffs addressed as follows:

Susan Talcott Camp, Esq.
Reproductive Freedom Project
American Civil Liberties Union Foundation
125 Broad Street
New York, New York 10004

Dated: New York, New York
November 21, 2003

/s/
SHEILA M. GOWAN

**MINER, BARNHILL & GALLAND, P.C.**
ATTORNEYS AND COUNSELORS

CHARLES BARNHILL, JR.
JEFFREY I. CUMMINGS
WILLIAM P. DIXON*
ELIZABETH EBERLE++
GEORGE F. GALLAND, JR.
NANCY L. MALDONADO
WILLIAM A. MICELI
JUDSON H. MINER
GEOFFREY C. RAPP
SARAH E. SISKIND+
PAUL L. STRAUSS
LAURA E. TILLY
MARNI WILLENSON

Of Counsel:

BARACK OBAMA
BRADLEY SCOTT WEISS

14 WEST ERIE STREET
CHICAGO, ILLINOIS 60610
(312) 751-1170
TELECOPIER (312) 751-0438

E-MAIL GGALLAND@LAWMBG.COM

WISCONSIN OFFICE
Suite 803
44 EAST MIFFLIN STREET
MADISON, WISCONSIN 53703
(608) 255-5200
TELECOPIER (608) 255-5380

*ONLY ADMITTED IN WISCONSIN AND DISTRICT OF COLUMBIA
+ONLY ADMITTED IN WISCONSIN AND NEW YORK AND FLORIDA
++ONLY ADMITTED IN WISCONSIN AND CALIFORNIA

December 24, 2003

Sheila M. Gowan, Esq.
Assistant United States Attorney
33 Whitehall Street, 8th Floor
New York, NY 1004

Re: *National Abortion Federation et al. v. Ashcroft*

Dear Ms. Gowan:

This confirms our conversation today about the subpoena served by the Government on Northwest Memorial Hospital on December 21, 2003. As I told you, NMH may well instruct me to object before the Northern District of Illinois to production of its patients' medical records, and I discussed very briefly with you the grounds on which NMH may object. Nonetheless, NMH will cooperate with the parties to the lawsuit to facilitate prompt production of these records if in fact they must be produced. To that end, my understanding is as follows:

1. The Government will agree to NMH redacting patient-identifying information from the copies of any records produced to the Government. If at a later time you perceive some reason to identify a patient by name, you will advise me and we will discuss the matter.

2. Without waiving its right to object to their production, NMH will immediately give Dr. Hammond permission to examine the records and other information he needs for purposes of identifying to NMH the patient numbers sought by your interrogatories. NMH will begin at once the process of making copies of the medical records with patient-identifying information redacted. By getting this process started, we hope to minimize or eliminate delays in the production of redacted records if in fact the records must be produced.

3. I raised with you the fact that some of the patients in question are likely to have extensive medical records at NMH that go far beyond their abortion procedures or the medical reasons that influenced the decision to abort. We agreed that once that NMH has identified the patient charts in

EXHIBIT
K

Sheila M. Gowan, Esq.
December 24, 2003
Page Two

question, we will have a better handle on the extent to which this will be a problem, and that you and I can then discuss how to avoid producing irrelevant or unnecessary records.

After I spoke to you, I spoke with Lorie Chaiten, counsel for Dr. Hammond. She says that Dr. Hammond will cooperate with our plan. She did inform me of three time constraints which he will have to deal with. First, beginning December 26, 2003, and continuing until January 2, 2004, he has "night float" duty in which he will be working nights, all night, in the hospital, covering for his own and other obstetricians' patients. Despite this arduous schedule, Ms. Chaiten says that he may be able to find some time during those nights to engage in the extensive review of medical charts that will be necessary in order to identify the patients in question and thereby pin down the charts that we will be copying. Second, he will be working on an expert report during this period which he is required to produce for the litigation. Third, Dr. Hammond will be out of town from January 9 through January 17, 2004, and during that period he will be unable to work on this project. Subject to those time constraints, she says that Dr. Hammond will do his best to work with NMH so that we can minimize the time needed to produce any records that are ordered produced.

Please let me know if I haven't correctly summarized our understandings. Thank you for your cooperation.

Sincerely,

George F. Galland, Jr.

GFG/sm

cc: Rachel Dvorken, Esq.
Triste Lieteau
Lorie A. Chaiton, Esq.
Talcott Camp, Esq.
Nancy Maldonado, Esq.

CERTIFICATE OF SERVICE

The undersigned, under penalty of perjury, certifies that on January 7, 2004, a true and correct copy of the above and foregoing **MOTION TO QUASH SUBPOENA, AND MOTION TO FILE BRIEF IN EXCESS OF FIFTEEN PAGES IN SUPPORT OF THAT MOTION** was served on the attorneys named in this notice by FAX and Federal Express.